**Brendan COSGROVE, a Disabled Student by his parents, Robert and Janice Cosgrove, Plaintiffs,**

v.

**The BOARD OF EDUCATION OF THE NISKAYUNA CENTRAL SCHOOL DISTRICT; Jay Briggs McAndrews, Superintendent of the Niskayuna Central School District, Defendants.**

No. 01–V–1017.

United States District Court, N.D. New York.

July 3, 2001.

Young, Sommer Law Firm, Executive Woods, Albany, NY (Kenneth S. Ritzenberg, Esq., Karen Wade Cavanagh, Esq., of counsel), for Plaintiffs,

Higgins, Roberts Law Firm, Schenectady, NY (Michael Basile, Esq., of counsel), for Defendants,

## MEMORANDUM—DECISION & ORDER

McAVOY, District Judge.

### I. BACKGROUND

The parties stipulated to most of the background facts at the underlying administrative hearing and are taken from the June 4, 2001 written findings of fact and decision of Impartial Hearing Officer Tia Schneider Deneberg ("IHO") in *The Matter of an Educationally Disabled Student, Brendan Cosgrove, by his parents, Robert and Janice Cosgrove and The Board of Education of the Niskayuna Central School District* ("Decision"), unless indicated to the contrary. Brendan Cosgrove ("Brendan") was born on September 20, 1979 and, in May of 1980, he contracted spinal meningitis which resulted in numerous and severe disabilities. Brendan has limited gross motor control and is wheelchair bound. He has limited control over his power wheelchair and is "totally dependent on others for his activities of daily living, such as dressing, eating and toileting."

Brendan and his family became residents of the Niskayuna Central School District ("the District") in August, 1985

and thereafter received special education through the District's placements. Until 1992, it was believed that Brendan had some hearing capacity, however, thereafter it was determined that he is totally deaf. Brendan cannot utter words, but is capable of vocalizations and communicates through the use of a picture/symbol book which was set up by a deaf services consultant during the 1993–1994 school year. This consists of approximately 50–60 vocabulary words.

During the 1995–1996 school year, school placement was with Capital District BOCES at the Farnsworth Middle School. Placement was with QUESTAR III, beginning in the summer, for the 1996–1997 school year. During the 1997–1998, 1998–1999, 1999–2000 and 2000–2001 school years, placement was at the Perkins School for the Blind in Watertown, Massachusetts, a private school ("the Perkins School"). At the administrative hearing, the parties stipulated that placement at the Perkins School was appropriate for Brendan. There appears to be no dispute that this placement was for twelve month programming.

### A. Impartial Hearing

For purposes of context, Brendan turned 21 years old on September 20, 2000. Brendan's parents requested an Impartial Hearing on January 22, 1999 asserting that he had been denied a Free Appropriate Public Education ("FAPE") during school years of 1995–1996 and 1996–1997 and sought "compensatory education" for those years. The IHO's Decision found that Brendan was denied a FAPE during the 1995–1996 and 1996–1997 school years and ordered compensatory education, declaring that Brendan has the right to remain at the Perkins School, at public expense, for an additional two school years. In making this determina-

tion, the IHO cited the inadequacies of the special education program provided to Brendan at the BOCES & QUESTAR III program as follows:

> No consensus emerged in the IEP Planning Process, which therefore must be judged deficient. During the year at Capital District BOCES he was largely denied the beneficial company of deaf peers and kept in a classroom where he was considered an oddity. He was slighted by the teacher, who improperly delegated the instructional function to an interpreter. Throughout the year at QUESTAR, the staffing was in a state of flux that had to be confusing for him. There were four different individuals acting as teacher, periods without an individual interpreter, which limited his mainstreaming activities, and an interpreter who became his teacher and then resumed her former role. An unauthorized technique was applied by the interpreter, and no permanent solution was found to his communication problem. There was not even a match between the sign language that he experienced and the language used by the interpreter.

Decision, pp. 9–10.

### B. Need for Preliminary Injunction

The Plaintiffs assert that on June 12, 2001, the District advised the Plaintiffs' counsel that it was appealing the IHO's Decision to the State Review Officer ("SRO") and that, because Brendan turned 21 years of age during the 2000–2001 school year, felt pendency under the controlling statutes (discussed below) did not apply during the appeal process. Brendan left the Perkins School on June 15, 2001, which constituted the end of the 2000–2001 academic year and was, according to the Plaintiffs, scheduled to return for the summer session on Monday, June 25, 2001.

On June 21, 2001, the Plaintiffs commenced the instant action and presented an Order to Show Cause to the Court seeking a preliminary injunction enjoining the Defendants from suspending Brendan's educational services during the appeal of the administrative Decision. They also request that the injunction require the District to pay for such services. The Complaint alleges violations of rights secured by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1490;[1] the Civil Rights Act, 42 U.S.C. § 1983; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; the Rehabilitation Act of 1973, 29 U.S.C. § 794; and Article 89 of the New York State Education Law. The Complaint seeks "an injunction mandating ... that Brendan remain at the Perkins School immediately following his age out and during the pendency of any appeal, at public expense, attorneys' fees and related relief."

The Court granted the Order to Show Cause, which did not seek any *ex parte* or immediate relief, and imposed an expedited briefing schedule. The Court held a hearing on June 28, 2001 and, with the exception of a joint exhibit consisting of Brendan's 2000–2001 Individualized Education Program (hereinafter "IEP"), both parties agreed that there was no need for the presentation of further evidentiary proof. Counsel presented oral argument at this time.

Plaintiffs assert that even a short delay in Brendan's return to his educational program will cause devastating consequences and irreparable harm. The Plaintiffs have submitted an affidavit from Mary Zatta, Assistant Superintendent for the Deafblind Program at the Perkins School. She was the coordinator for Brendan's evaluation when he came to the Perkins School and has been involved in his program since. She asserts the following pertinent facts/opinions:

a. Brendan is a deaf/multiply disabled student in the Deafblind Program.

b. He receives an integrated program which includes a range of educational, clinical, and support services. The Perkins School has 25 community work sites and Brendan has participated in a number of those.

c. The "largest focus" of Brendan's program is in the area of language and communication development as he is unable to express himself "in any of the typical ways." He understands sign language but, because of physical challenges, is unable to produce sign language. A significant component of Brendan's team includes a computer teacher, a physical therapist, an occupational therapist, and a speech and language therapist in conjunction with classroom teachers in order to assist Brendan with his communication needs.

d. During the last four years, Brendan has been involved in three different trials with electronic communication devices. "Brendan now demonstrates a readiness for use of a dedicated communication device."

e. "We have made extraordinary progress with Brendan and believe that we are on the verge of a significant breakthrough which will assist Brendan with his communication needs. If Brendan is removed from the Perkins School at this time, he will, undoubtedly, slide backwards and all

---

1. In 1997, IDEA was "completely revised" and its sections renumbered. 20 U.S.C.A., Chapter 33, History Note at 9 (West 2000). All relevant portions of the new law went into effect on July 1, 1998. The current enumeration is used unless indicated otherwise.

the progress to date could be for naught."

f. Perkins school provides summer programing during the last week of June and the month of July. It is closed during the month of August.

g. "In years past, when Brendan returns from the August Break, after Labor Day, it takes him almost two months to return to the levels he had achieved as of the end of the prior July. If Brendan were to miss the five week program during the Summer of 2001, it would take him almost an entire year to return to his current levels."

Defendants have submitted an affidavit from Kathleen Spring–Townley, Administrator for Special Education Programs and Services for the Niskayuna Central School District, contradicting most of the factual allegations of Ms. Zatta's affidavit. Ms. Spring–Townley asserts that she has been actively involved in administering programing for Brendan since the fall of 1998, is familiar with the educational background and services provided to Brendan throughout his education with the School District, attended most of the due process hearing sessions and heard most of the testimony provided in the hearing, and has been involved with Ms. Zatta in Brendan's programing including a May 31, 2001 Committee on Special Education ("CSE") transitional planning/exit review for Brendan. She asserts:

a. At the May 31, 2001 exit/transition review, Brendan's parents, the school district, and representatives of the Perkins School met to identify appropriate placement for Brendan for his life after school and to assist in "transitioning Brendan" into that program.

b. Neither Ms. Zatta or any representative of the Perkins School mentioned a "breakthrough" for Brendan and instead indicated that he was "making slow, steady progress."

c. The progress reports from and communications with the Perkins School over the years that Brendan attended that school never mentioned that Brendan was on the verge of any breakthrough nor had the District been provided any plans or strategies for achieving same.

d. At the May 31, 2001 meeting, the plan was to transition Brendan to a post-school residential placement at a facility in Lake Luzerne operated by the State of New York and to provide "day hab services" through a program in Corinth, New York, both of which were funded entirely by the State.

e. At the May 31, 2001 meeting, "personnel from Perkins School ... indicated that they would meet with the personnel at the state facility to assist in transition and to discuss adaptations and modifications, including a discussion of appropriate communication methods. Thus, Brendan will continue to receive services in all appropriate areas, including utilization of communication devices, now that he has completed his childhood education."

f. There has never been any previous mention by Ms. Zatta or any other personnel at the Perkins School that Brendan takes almost two (2) months to return to previous levels after he returns to the school from the August Break.

g. In her opinion, Brendan is not on the verge of any breakthrough and he will not show significant regression as a result of his transition

from Perkins School to the state programs.

In reply, Brendan's father submits an affidavit which indicates, *inter alia,* that the May 31, 2001 meeting took place before the June 4, 2001 Decision granting compensatory education. The essence of the affidavit is that the May 31, 2001 meeting was an attempt to make the best of what appeared to be a foregone conclusion, namely, that Brendan's education with the District was ending. However, Mr. Cosgrove indicates that the services which the State may provide are far from adequate. He indicates that none of the personnel or other residents at the Lake Luzerne residential placement or the Corinth program can sign fluently. Thus, he asserts, personnel will be unable to communicate with Brendan who will be "isolated." He notes further that due to Brendan's physical challenges, he requires the assistance of others to turn the pages of the picture/symbol book which Brendan then points to with a light beam attached to his head. The Perkins School, however, was working on an electronic device designed to "allow Brendan to form a sentence, send the sentence, and effectively speak through a computer-like device" which would "allow Brendan to initiate conversation and communicate independently for the first time in his life."

The jointly submitted 2000–2001 IEP indicates on page 2–1 under "Management Needs" as follows: "Recommend 12 month program as student would experience regression in academic and social emotional areas without the continuity and structure of the private day program." The IEP indicates on page 2–2 as follows: "Post–Secondary Education: Brendan hopes to utilize a computerized communication device and power operated wheel chair in the near future. He would benefit from ongoing training and supports in order to learn how to operate the power chair and the communication device." Further, on page 2–3, the "Least Restrictive Environment" section provides: "The student's academic and management needs are such that he/she is recommended for residential placement based upon the intense support required for the student to succeed. A program of special educational day services would not provide enough structure and services to meet these needs as this time."

## II. DISCUSSION

Plaintiffs argue initially that Brendan's right to "pendency" under the present circumstance is "well established" and that he is entitled to the automatic statutory injunction provided by the IDEA and Article 89 of the New York Education Law. The Plaintiffs further argue that even absent the IDEA's "stay put" provisions of pendency, the facts meet the traditional elements for a preliminary injunction. The Defendants oppose the motion on all grounds, arguing primarily that the IDEA does not apply and the facts of the case do not fall within the qualifications for granting a traditional preliminary injunction. The Court will address the application of the IDEA and its "stay put" provision first.

### A. *IDEA & Pendency*

#### 1. *IDEA Due Process*

The IDEA requires participating states to provide "all children with disabilities" a "free appropriate public education." 20 U.S.C. § 1412(a)(1)(A).[2] Because the stat-

---

**2.** A "free appropriate public education" under the IDEA is one that is "provided in conformity with the individualized education program required under section 1414(d)." 20 U.S.C. § 1401(8). The particular services required to meet the child's educational needs

ute requires that the IEP be reviewed and revised each school year, 20 U.S.C. § 1414(d), the IDEA imposes elaborate procedural requirements to be followed in the event of a disagreement between the parents and the local educational agency with respect to the child's IEP. 20 U.S.C. § 1415.[3]

In New York, parents who object to an IEP may request an "impartial due process hearing" before an IHO appointed by the local board of education. *See* § 4404(1); N.Y. Educ. Law § 4404. A party aggrieved by the IHO's decision may then appeal that decision to the State Review Officer ("SRO"). 20 U.S.C. § 4402(2); N.Y. Educ. Law § 4404. When a final administrative decision has been rendered, a dissatisfied party may then bring a civil action in either federal or state court. 20 U.S.C. § 1415(i)(2); N.Y. Educ. L. § 4404(3).[4] In the instant case, Brendan's parents utilized this "due process" procedure to seek a remedy for the alleged inadequacy of the services Brendan actually received for the 1995–96 and 1996–97 academic years. As is clear from the parties' briefs to the IHO and the IHO's June 4, 2001 Decision, the issue before the IHO was limited to whether

Brendan is entitled to "compensatory education" for these two years.

*2. Pendency*

Section 1415(j) contains what is known as the IDEA's "pendent placement" or "stay put" provision. *Board of Educ., Pawling Cent. Sch. Dist. v. Schutz*, 137 F.Supp.2d 83, 88 (N.D.N.Y.2001) (Hurd, D.J.). This provides, in pertinent part:

> During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then-current educational placement of such child.

20 U.S.C. § 1415(j) ("Section 1415(j)").[5]

■ Section 1415(j) represents "Congress' policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved." *Susquenita Sch. Dist. v. Raelee S.*, 96 F.3d 78, 83 (3d Cir.1996) (quoting *Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 864–65 (3d Cir.1996)). The Second Circuit has described Section 1415(j) as an "automatic preliminary in-

---

must be set forth at least annually in a written IEP. *M.C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 62 (2d Cir.2000) (citing 20 U.S.C. § 1414(d)(4)(A)(i)).

**3.** These procedural safeguards are to "guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think are inappropriate." *Honig v. Doe*, 484 U.S. 305, 311–12, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988).

**4.** Section 1415(i)(2), 20 U.S.C. § 1415(i)(2), of the IDEA provides in relevant part:

Any party aggrieved by the findings and decision made under [this] subsection ... shall have the right to bring a civil action with respect to the complaint presented

pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy. In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

**5.** New York Education Law § 4404(4)(a), the state pendency provision, contains nearly identical language. Therefore, the analysis will be the same under both.

junction" which "substitutes an absolute rule in favor of the status quo for the court's discretionary consideration of the factors of irreparable harm and either a likelihood of success on the merits or a fair ground for litigation and a balance of hardships." *Zvi D. by Shirley D. v. Ambach,* 694 F.2d 904, 906 (2d Cir.1982).[6]

### 3. Then Current Educational Placement

■ Neither the statute nor the legislative history instructs a reviewing court how to identify the "then current educational placement." Most courts recognize that a student's "then current educational placement" is the placement of the student to which the agency and parents consented before the parents requested a due process hearing. *Warton v. New Fairfield Bd. of Educ.,* 125 F.Supp.2d 22, 25 (D.Conn.2000) (citing *Zvi D.,* 694 F.2d at 906). Here, there can be no dispute that at the time of the commencement of the due process hearing in question, and indeed, throughout the lengthy proceeding,[7] Brendan was placed at the Perkins School. The parties stipulated at the due process hearing that Brendan was placed at the Perkins School for the last four (4) academic years pursuant to his IEP, and that "the current placement, at the Perkins School in Massachusetts, is appropriate." Decision, p. 5.

Given the parties' agreement that the Perkins School was appropriate placement during the last four (4) academic years as evidenced by the parties' stipulation and by Brendan's 2000–2001 IEP, Brendan's "then current educational placement" is at the Perkins School. This determination, however, is given effect only if the matter is one under an application of the IDEA through which pendency would apply. This weighty question will be addressed in a moment.

### 4. Exhaustion of Administrative Remedies

The Defendants also argue that because the Plaintiffs have not yet exhausted administrative remedies, the matter before the Court is not ripe.

■ Exhaustion of administrative remedies is required before a parent may seek judicial remedies under the IDEA. *Honig v. Doe,* 484 U.S. 305, 327, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). However, the requirement to exhaust administrative remedies does not apply where the moving party has demonstrated that the administrative process would be futile or inadequate. *Id.* The District argues that because of the uniqueness of the questions now before the Court, the Plaintiffs should have sought an opinion from the SRO on whether pendency applies during the appeal process in this case.

■ Courts have held that parents seeking to invoke the stay-put provision of the IDEA need not exhaust their administrative remedies. "Were exhaustion required, it would defeat the purpose behind the stay-put provision, which determines

---

**6.** As Judge Hurd wrote in *Schutz:* "In other words, once the parents prove their child's current educational placement (whether it be in public or private school), the local educational agency is then required to maintain that placement under the IDEA." *Schutz,* 137 F.Supp.2d at 92.

**7.** The IHO's June 4, 2001 Decision indicates, in pertinent part, that "hearings were held on

11 days between December 9, 1999 and May 8, 2000. In late November, 2000, the parties filed extensive briefs and submitted the full text of cited authorities, as well as digital copies. The record includes 11 transcript volumes and voluminous exhibits." Decision, p. 2. The entire process, from invocation of due process until the IHO's decision, took approximately 2.5 years.

the child's interim placement during the pendency of administrative proceedings." *Murphy v. Arlington Cent. Sch. Dist. Bd. Of Educ.*, 86 F.Supp.2d 354, 357 (S.D.N.Y. 2000) ("Indeed, the protection of the stay put rule would be of little benefit if the plaintiffs are forced to proceed with administrative remedies in order to apply it. . . . [T]he rule is intended to protect the student during the challenge to the change in placement.") (citing *Cole v. Metropolitan Gov. of Nashville and Davidson County, Tenn.*, 954 F.Supp. 1214, 1221 (M.D.Tenn.1997)).

It is unclear from the Defendants' suggestion that the Plaintiffs should have sought a determination on the pendency issue whether or not the State Department of Education would entertain this limited issue in the first instance and, if so, the time frame for its decision.[8] Further, the Plaintiffs assert that the issue now before this Court requires direct and immediate determination and, given the Defendants' position that pendency does not apply and given further the protracted administrative proceedings to date, resort to such a forum would be futile to protect Brendan's rights.

█ As the Plaintiffs correctly point out, the administrative appeal process is available only to a party which is "aggrieved" by an IHO's determination. 20 U.S.C. § 1415(d); N.Y. Educ. Law § 4404. Because the Plaintiffs prevailed at the administrative hearing, they have no basis to appeal. Under such circumstances, the Plaintiffs, by seeking a due process determination and prevailing, have exhausted their administrative remedies on the underlying issue. *Sabatini v. Corning–Painted Post Area Sch. Dist.*, 78 F.Supp.2d 138, 140 (W.D.N.Y.1999).

█ The Court finds that given the assertions of irreparable harm, given the Plaintiffs' prevailing party status in the underlying administrative hearing, and inasmuch as this dispute is clearly one between the parties over what is Brendan's current educational placement, if there is one, the Plaintiffs are properly before this Court. Further, even if the administrative remedies were not properly exhausted, the Court has authority to address the preliminary injunction under 42 U.S.C. § 1983. *See A.T., I.T. v. New York State Educ. Dep't*, 1998 WL 765371, at * 11 (E.D.N.Y. Aug. 4, 1998) (finding authority to enforce IDEA violations under § 1983 and granting injunctive relief without exhaustion requirement fulfilled).

Next, the Court will address the application of the IDEA beyond a student's twenty-first (21st) birthday.

### B. Application Beyond Age 21

#### 1. IDEA itself Beyond Age 21

The Plaintiffs argue that "nothing in the statute suggests the right to pendency expires at the age of twenty-one where due process was invoked by the parents in a timely manner." Pls.' Mem. of Law, at p. 8. The Plaintiffs cite the wording of the pendency section and argue that when Congress wrote that pendency shall apply "until all such proceedings have been completed," it did not say that pendency shall apply through all proceedings "or until the child is no longer eligible for services whichever comes first." *Id.* The Court recognizes the age-old tenant of statutory construction, *inclusio unius est exclusio alterius.* However, the Court is not persuaded that the silence in this one section is not premised upon the overall limitation

---

**8.** Plaintiffs assert in the Complaint that the Defendants opposed presenting this question to the IHO.

of the IDEA as set forth elsewhere in the statute. 20 U.S.C. § 1412(a)(1)(A).

Whether or not the IDEA applies to students beyond the age of twenty-one (21) is an unsettled question. *See Burr v. Ambach,* 863 F.2d 1071, 1078–79 (2d Cir.1988), *vacated sub nom., Sobol v. Burr,* 492 U.S. 902, 109 S.Ct. 3209, 106 L.Ed.2d 560 (1989), *reaff'd, Burr v. Sobol,* 888 F.2d 258 (2d Cir.1989), *cert. denied,* 494 U.S. 1005, 110 S.Ct. 1298, 108 L.Ed.2d 475 (1990) (child has no right to demand public education beyond age twenty-one); *Board of Educ., Oak Park & River Forest H.S., Dist. 200 v. Illinois State Bd. of Educ.,* 79 F.3d 654, 656 (7th Cir.1996) ("the Act entitles disabled individuals to special education assistance only until they reach the age of 21"); *Parents of Student W. v. Puyallup Sch. Dist.,* 31 F.3d 1489, 1497 (9th Cir.1994) (IDEA benefits expire upon "reaching age 21"); *Wenger v. Canastota Cent. Sch. Dist.,* 979 F.Supp. 147, 150–51 (N.D.N.Y.1997) (Scullin, D.J.) ("Generally, under the IDEA, 'a disabled child does not have a right to demand a public education

beyond the age of twenty-one.' ") (quoting *Mrs. C. v. Wheaton,* 916 F.2d 69, 76 (2d Cir.1990)), *aff'd,* 208 F.3d 204 (2d Cir. 2000); *but see St. Johnsbury Academy v. D.H.,* 240 F.3d 163, 168–170 (2d Cir.2001) (holding that unless participating state's law limits a FAPE to the 21st birthday, IDEA applies to age 22); *Pihl v. Massachusetts Dept. of Educ.,* 9 F.3d 184, 189 (1st Cir.1993) ("he ceased to be eligible for educational services under the IDEA in 1988, when he turned 22").

The Second Circuit addressed this issue recently in *St. Johnsbury* and determined that the IDEA applies to persons who have not yet reached their 22nd birthday provided the state law of the student's home does not limit a free appropriate public education to the age of 21. *St. Johnsbury,* 240 F.3d at 168.[9]

In harmonizing *St. Johnsbury* with *Burr,* the Circuit pointed out that the *Burr* decision turned on New York law which limits a FAPE up to age 21,[10] and therefore the two decisions were not contradecisive. *St. Johnsbury,* 240 F.3d at 169.[11]

---

**9.** The Court reached this conclusion by interpreting the wording of the IDEA which defines IDEA application to persons "between the ages of 3 and 21, inclusive." 20 U.S.C. § 1412(a)(1)(A). The Circuit determined that the use of the term "inclusive" "means that the relevant period begins on a child's third birthday and ends on the last day of his 21st year (which culminates in his 22nd birthday)." *St. Johnsbury,* 240 F.3d at 168.

However, the Circuit also noted in *St. Johnsbury* that § 1412(a)(1)(B)(i) of the IDEA provides that the statute "applies to children 'aged … 18 through 21' only if that is consistent with State law on the provision of public education." *St. Johnsbury,* 240 F.3d at 169 (emphasis in original). In *St. Johnsbury,* the Court addressed a situation in Vermont where state education law, unlike New York's Education Law, does not expressly limit a FAPE up to the age of 21.

**10.** New York Education Law provides that only "person[s] over five and **under twenty-**

one years of age" are eligible to receive a public education. N.Y. Educ. Law § 3202(1) (McKinney 1995 & Supp.2000) (emphasis added). New York Education Law § 4402(1)(a) also provides that each school district must ascertain "the number of children with handicapping conditions in such district **under the age of twenty-one** years." N.Y. Educ. Law § 4402(1)(a) (McKinney 1995 & Supp.2000) (emphasis added).

**11.** In this regard, the Circuit stated in *St. Johnsbury:*

Obviously, the New York statutes at issue in *Burr* were *not* consistent with an application of IDEA beyond the 21st birthday; so IDEA afforded the plaintiff no basis for contesting the point that ordinarily he would have aged out on his 21st birthday. Rather, he claimed "an award of compensatory public education beyond his twenty-first birthday" to make up for the deprivation of a free education for a period of time

For the present situation, New York Education Law applies and thus *St. Johnsbury* offers no assistance to the Plaintiffs.

Plaintiffs argue, however, that "here, the parents do not seek to invoke the pendency provisions but rather to prevent the Defendants from unlawfully revoking Brendan's right to pendency." Pls.' Memo. of Law, pp. 12–13.[12] As framed, the Plaintiffs raise a distinction without a difference. However, it appears that the argument is that the pendency provision continues beyond the 21st birthday *if* the IDEA can be said to be continued beyond 21 *by* an award of compensatory education. Thus, in the fist instance, the determination here turns on whether the award of compensatory education to Brendan operates as an extension of the IDEA in certain limited circumstances, or whether, such an award is a completely separate and distinct operation of law relying on, but not part of, the IDEA. The former would seem to invoke all of the procedural safeguards of the IDEA, including pendency, whereas the latter would not.

### 2. Compensatory Education Beyond Age 21

■ An award of compensatory education for a child over the age of twenty-one is one of the several equitable remedies available and which may be appropriate "where there has been a gross violation of the IDEA." *Wenger*, 979 F.Supp. at 151;

*Butler v. South Glens Falls Cent. Sch. Dist.*, 106 F.Supp.2d 414, 419 (N.D.N.Y. 2000) (Hurd, D.J.). Such an award requires a school district to provide education past a child's twenty-first birthday in order to make up for the earlier deprivations. *Searles v. Board of Educ., Ellenville Central Sch. Dist.*, 1999 WL 34983, at *4 (N.D.N.Y. Jan.13, 1999) (McAvoy, C.J.). It is an equitable remedy directed at a school district's failure to provide that which was obligated to provide earlier. *Burr*, 863 F.2d at 1078.

### 3. Pendency Beyond Age 21 for Compensatory Education

Defendants assert that pendency does not apply to awards of compensatory education. The Plaintiffs assert that it does if it was "invoked" before the 21st birthday. The question which evolves, therefore, is whether the equitable remedy of compensatory education carries with it the statutory obligation of pendency.

In *Burr*, the Second Circuit addressed the propriety of an award of compensatory education from the perspective of its equity foundation.[13] In addressing the substantive merits of the award, the Circuit held that the student was "entitled to a remedy for deprivation of the right that the statute clearly provided him—a free appropriate education between the ages of three and twenty-one." *Burr*, 863 F.2d at 1078. The Court further held that because

---

before he reached that age, *Burr*, 1987 WL 19957, *1, and our holding was that an award of compensatory education *beyond* the 21st birthday was proper for that reason. *See Burr*, 863 F.2d at 1078. *St. Johnsbury*, 240 F.3d at 169 (emphasis in original).

12. The Plaintiffs assert further that "even if the District were correct and pendency could not be 'invoked' by a student over twenty-one in New York state, it is the District's action by choosing to continue the proceeding which

they contend allows them to unilaterally remove Brendan from his placement." Pls.' Mem. of Law, at p. 13. The issue of whether pendency is even invoked is addressed at subsection II(B)(4), *infra*.

13. In that case, the student, a severely handicapped 20 year old, was awarded one and one-half years of compensatory education in an administrative due process hearing which was affirmed by the Commissioner of the New York State Department of Education. *Burr*, 863 F.2d at 1072.

the statute "authorizes a district court to award 'such relief as the court determines is appropriate,'" the right created by Congress in affording each student a FAPE would be merely illusionary if a remedy such as compensatory education did not exist. *Id.* Despite holding that the statute applied only up to a student's twenty-first (21st) birthday, the Court held that "[i]n some circumstances, the scope of the remedy can extend beyond the scope of the original right." *Id.* (citing *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971)).

The focus of the relevant portions of *Burr* was on the available equitable remedies when federally created rights are infringed upon.[14] The authority granted by Congress to the federal courts to fashion a remedy was the vehicle through which compensatory education was allowed, not an extension of the "original right" itself. In this regard, *Burr* quoted *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946), for the proposition that: "[I]t is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Burr,* 863 F.2d at 1078 (emphasis added). The *Burr* Court also quoted *School Comm. of the Town of Burlington v. Dept. of Educ.,* 471 U.S. 359, 374, 105

S.Ct. 1996, 85 L.Ed.2d 385 (1985), for the proposition that "equitable considerations are relevant in fashioning relief." *Id.* (emphasis added).

The Second Circuit has stated at other times that the IDEA itself "broadly authorizes a district court to 'grant such relief as the court determines is appropriate.'" *Muller v. Committee on Special Educ. of the East Islip Union Free Sch. Dist.,* 145 F.3d 95, 104 (2d Cir.1998) (quoting 20 U.S.C. § 1415(e)(2)). That relief, however, arises from equity and is not a legislative authorization to extend the reaches of the statute.

In *K.P. v. Juzwic,* 891 F.Supp. 703 (D.Conn.1995), relied upon by the Plaintiffs, the District of Connecticut addressed the precise issue now before this Court, that is, whether a preliminary injunction should issue which maintains a 21–year-old in a special education placement at school expense while the issue of compensatory education was litigated.[15] In a thorough decision in which the District Court ultimately granted a preliminary injunction, the District Court applied a preliminary injunction analysis invoking the traditional preliminary injunction standard and using "stay put" policy consideration to reach its conclusion.

*Juzwic* did not directly answer the question now before the Court,[16] however, the

---

14. In concluding its analysis to uphold the award of compensatory education, the Circuit in *Burr* again underscored the limitation on the underlying right, however, stating: "If, in this case, we do not allow an award of compensatory education, then [the student's] right to an education between the ages of three and twenty-one is illusory." *Burr,* 863 F.2d at 1078.

15. In *Juzwic,* the state hearing examiner never addressed the merits of the claim for compensatory education but instead dismissed the administrative proceeding on a procedural

grounds, finding that the claim was not timely filed. The District Court concluded that the claim was timely filed and granted the preliminary injunction pending the litigation of the merits of the compensatory education claim.

16. In this regard, the District Court in *Juzwic* noted that while application of the stay put provisions of the IDEA ordinarily requires the school to pay for the placement during pendency, the plaintiff in that case sought to have a school district other than his last-attended school district pay for the compensatory education. *Juzwic,* 891 F.Supp. at 711. Thus, the

*Juzwic* analysis is instructive on the issue of whether the stay put provision is merely part of the IDEA's procedural framework that vanishes when the student turns twenty-one, or whether it is an equitable remedy available beyond twenty-one.

*Juzwic* reasoned that the stay-put provision of the IDEA was not mutually exclusive with the grant of judicial power to fashion a remedy upon the breach of the IDEA.[17] *Juzwic*, 891 F.Supp. at 712 (quoting *Honig v. Doe*, 484 U.S. at 327, 108 S.Ct. 592[18]). In fact, *Juzwic* determined, the stay put provision and "the policy underlying it can be read in conjunction with" the IDEA's "grant of authority to federal courts to fashion all appropriate equitable relief." *Id.* Thus, *Juzwic* concluded that a court could "base injunctive relief favoring the status quo on [the stay put provision] or base injunctive relief changing the funding of an educational placement on the court's traditional equitable powers under [the Congressionally granted power to fashion an appropriate remedy]." *Id.* (citing *Doe v. Brookline Sch. Committee*, 722 F.2d 910, 918 (1st Cir.1983)).

Attention must be paid to the wording use in *Juzwic* which cloaked a court's authority to grant injunctive relief as based on the stay put provision. There is, in this Court's opinion, a difference between basing an equitable power on considerations enunciated under a legislated obligation and actually invoking the statutory provision.

### 4. Conclusion, "Stay Put vs. Preliminary Injunction"

 In this case, given the above-cited decisions and the constellation of facts before the Court, there is a compelling basis to conclude that a "stay put" provision may apply but not the IDEA's automatic pendency provision. The Court concludes that it cannot base its determination on a simple, blind application of the IDEA's stay put provision but rather must take into account the various equity considerations before making a decision. These considerations will take their emphasis and direction from the traditional test for granting a preliminary injunction but the Court will apply them within the context of the policy underpinnings of the IDEA and its pendency provision. The Court reaches this conclusion based upon a number of factors.

Certainly, given the Court's broad equitable powers to remedy violations of the IDEA and the clear Congressional intent to insure children's right to education aris-

Court concluded, that case did "not present the typical set of facts which face courts addressing the funding of interim placements" under the stay-put provision, and therefore, "notwithstanding the availability of the 'automatic injunction' in favor of the plaintiff, under the [IDEA's pendency provision], the granting of injunctive relief requires further analysis." *Juzwic*, 891 F.Supp. at 711.

From that decision, it appears that the determination to provide "further analysis" turned on the fact that the school district which the Plaintiff sought to hold financially responsible for the compensatory education was not the school district that placed the student where he sought to remain beyond his twenty-first year. Thus, the "pendency" issue involved questions of whether or not a nonparty to the then-present placement could be financially responsible for the "pendency" before the compensatory education was even determined on the merits to be warranted.

**17.** Formerly numbered Section 1415(e)(2) is identical to Section 1415(i)(2) under the present enumeration. *See, supra* note 4.

**18.** "The stay-put provision in no way purports to limit or preempt the authority conferred on courts by § 1415(e)(2) [the remedies provision under the former enumeration]; indeed, it says nothing whatever about judicial power." *Honig*, 484 U.S. at 327, 108 S.Ct. 592.

ing thereunder, the Court must exercise its discretion within the context of that which has already been dictated by Congress. It would be counter-intuitive to address a remedy for a breach of a right by applying a test that is considerably more onerous than securing the underlying right it is directed at correcting, or which has the consequential effect of defeating the remedy. By the same reasoning, however, the Court also recognizes that compensatory education is an equitable remedy for a past wrong, intending to make a student whole in the best manner possible. It is not a legislated extension of the IDEA itself. Congress did not state that if the IDEA is grossly breached, the IDEA will be applied for additional years.

Further, to extend the IDEA *in toto* for additional years could potentially dilute the remedy provided by a compensatory education award. Here, Brendan was awarded two years of compensatory education at the Perkins School. Applying the IDEA for an additional two years, as opposed to simply effectuating the award, would subject him and his parents to two additional years of CSE reviews and the potential for a recommended change in the IEP, which may not include the Perkins School placement. By not extending the IDEA to an award of compensatory education, the incentive for a school district to utilize its procedures to escape a financially burdensome award of compensatory education is removed.

Finally, the Plaintiffs asserted during oral argument that because the invocation of due process came well before the student's twenty-first birthday, "pendency" was already effectuated at the time the District refused to implement the compensatory education requirement. The Plaintiffs seem to argue that once the right

attaches it cannot be divested by age. The Court disagrees that statutory pendency ever attached in the first place and if it did, it was a technical attachment at best. Unlike in the "usual" pendency case where the question concerns a student's placement following a change by a parent or school, here neither the parents nor the school district sought to change Brendan's IEP once he was placed at the Perkins School. Rather, due process was invoked by the parents to address whether post-age-twenty-one compensatory education was appropriate. As the Plaintiffs' counsel conceded at oral argument, "pendency" was never an issue during the protracted administrative hearing because Brendan's placement throughout that time was secured by his then-current IEPs. The parties' Joint Exhibit supports this position, setting his IEP placement until the time of his graduation at the Perkins School.

Under the circumstances here, pendency did not become an issue, and thus was not even legally relevant, until Brendan "aged out" at the end of the 2000–2001 academic year. Because the underlying due process hearing did not seek to secure a remedy that could even come into effect until the student aged out, the Court can see no basis to conclude that statutory "pendency" was revoked. It simply did not attach in any real sense.

The Court, therefore, concludes that statutory pendency does not exist for Brendan. *See Oak Park & River Forest*, 79 F.3d at 659 ("We think that the stay-put provision does indeed cease to operate when a child reaches the age of 21. Except for the judge-created remedial exception for claims for compensatory education, the entitlements created by the [IDEA] expire when the disabled individual turns 21."); [19] *but see Carl B. & Maura B. on*

---

**19.** It is important to note, however, that un-

like in *Oak Park & River Forest*, 79 F.3d 654,

*behalf of Cara B. v. Mundelei H.S. Dist. 120 Bd. of Educ.,* 1993 WL 787899 (N.D.Ill. Sept. 3, 1993) (granting TRO in compensatory education case based upon pre-graduation invocation of pendency).

### C. *Preliminary Injunction—Traditional Test*

Turning to a preliminary injunction analysis, the Defendants argue that "Congress has placed a provision for injunctive relief within IDEA, thereby signaling its intent that a person making a claim under IDEA should not be entitled to an injunction under any other provision. Plaintiffs' failure to qualify for an injunction under IDEA should disqualify them from an injunction under any other provision of law." Defs.' Mem. of Law, p. 3.

The Defendants assert the IDEA as both a sword and shield by arguing that the IDEA pendency provision does not apply and that, therefore, the Plaintiffs are barred from seeking a traditional injunction. If the Court were to accept the Defendants' arguments, the results would be that the Plaintiffs would have no remedy. The Court does not agree that Congress intended such an anomalous result from the well-intentioned determination to include the pendency provision in the IDEA. The clear purpose of pendency provision is to protect the educational status quo of the student while the parents and the school fight out the legalities of the placement. The provision is student focused, not school district or parent focused. The remedy of compensatory education, which arises from the school district's failure to provide a student the FAPE in the first place, would be rendered nearly illusory if such an award was delayed during the lengthy legal proceedings. *See School Comm. of Burlington v. Dep't. of Educ. of Mass.,* 471 U.S. 359, 373, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (acknowledging the "long and tedious" nature of such proceedings). Further, preliminary injunctions beyond the pendency provision of the IDEA have been issued in numerous education-related circumstances. *Sabatini,* 78 F.Supp.2d at 143; *A.T., I.T. v. New York State Educ. Dept.,* 1998 WL 765371, at * 11 (E.D.N.Y. Aug. 4, 1998); *J.B. v. Killingly Bd. of Educ.,* 990 F.Supp. 57, 72 (D.Conn.1997); *Kantak v. Bd. of Educ., Liverpool Cent. Sch. Dist.,* 1990 WL 36803 (N.D.N.Y. March 30, 1990) (Munson, D.J.). As stated, the Court has authority to remedy the instant problem under 42 U.S.C. § 1983 even if IDEA exhaustion was not fulfilled. The Court, therefore, disagrees with the Defendants' position that the pendency provision in the IDEA is the Plaintiffs' sole injunctive remedy.

Under the traditional test for a preliminary injunction that seeks to maintain the status quo, "a party seeking a preliminary injunction must demonstrate '(1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief.'" *N.A.A.C.P., Inc. v. Town of East Haven,* 70 F.3d 219, 223 (2d Cir.1995) (quoting *Resolution Trust Corp.*

---

the parents here sought compensatory education some two and one half years before Brendan aged out. This is quite different than the situation frowned upon in *Oak Park* where the parents sought compensatory education three days before the student aged out and then used the IDEA's "stay put" provision to obtain that compensatory education before state review could be afforded. In the case at bar, there has been one level of administrative review which granted the relief, and, as set forth *infra,* the relief granted in this Court is of limited duration pending the next level of review.

*v. Elman,* 949 F.2d 624, 626 (2d Cir. 1991)). The " 'serious questions' prong is also frequently termed the 'fair ground for litigation' standard." *East Haven,* 70 F.3d at 223. Where a moving party challenges " 'government action taken in the public interest pursuant to a statutory or regulatory scheme,' " however, the moving party cannot resort to the "fair ground for litigation" standard, but is required to demonstrate irreparable harm and a likelihood of success on the merits. *Able v. United States,* 44 F.3d 128, 131 (2d Cir. 1995) (*per curiam* ) (quoting *Plaza Health Labs., Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989)).

When using this test, the Court must first determine whether the party seeking injunctive relief is trying to maintain or alter the status quo, and then must determine whether the opposing party is taking action in the public interest pursuant to a statutory or regulatory scheme. Inasmuch as the Court has already concluded that the "current educational placement" of Brendan is at the Perkins School under an IDEA analysis, and inasmuch as that placement was continued by the IHO's decision, it is clear that the Plaintiffs seek to maintain, not alter, the "status quo" through immediate implementation of the compensatory education award.[20] *Oak Park,* 79 F.3d at 657 (no ambiguity in status quo where parents wanted school to continue paying for compensatory education).

Further, Defendant has not asserted nor is it clear that the sought-after preliminary injunction will provide the movant with substantially all the relief sought or that relief cannot be undone even if the Defendants prevail at a trial on the merits. The underlying claim for compensatory education is not even before this Court and any relief granted here will necessarily be subject to the administrative appellate process. *See* Conclusion, *infra.*

Finally, denial of Brendan's compensatory education pending SRO review will not further a legitimate state interest or public policy. Rather, the reverse is true. Such a course of action will have the consequential effect of defeating the public interest of insuring a FAPE for all students pursuant to the statutory scheme of the IDEA. *See Cara B.,* 1993 WL 787899, at *3 ("The public interest in this case is that Cara remain in her current educational placement . . .; that is what the [pendency] statute provides. Injunctive relief will serve, and not disserve, the public interest.").

Therefore, the Court will not employ the more stringent test under the "mandatory injunction" cases which seek to alter the status quo. *See Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996) ("The moving party must make a 'clear' or 'substantial' showing of a likelihood of success where (1) the injunction sought 'will alter, rather than maintain, the status quo'—*i.e.,* is properly characterized as a 'mandatory' rather than 'prohibitory' injunction; or (2) the injunction sought 'will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits.' ").

### 1. *Irreparable Harm*

It is almost beyond dispute that wrongful discontinuation of a special education program to which a student is entitled subjects that student to actual irreparable harm. *See Sabatini,* 78 F.Supp.2d at

---

**20.** This scenario should be juxtaposed against the hypothetical scenario where the parents lost the compensatory education hearing before the IHO and were seeking a preliminary injunction imposing such education during the appeal process, which would clearly require a mandatory injunction test.

143 ("The denial of a FAPE over an extended period does constitute harm, and the longer that denial continues, the more irreparable it becomes."); *J.B.*, 990 F.Supp. at 72 ("Thus, J.B. continues to be denied his right to a free appropriate public education and until he receives that to which he is entitled under the IDEA, he is suffering irreparable harm."); *A.T., I.T.*, 1998 WL 765371, at *11 ("Z.T.'s injury is actual and imminent because she is currently being deprived of the free appropriate public education to which she is entitled under the IDEA.... In the absence of an injunction, Z.T. faces further damage to her development. This type of injury cannot be remedied by an award of monetary damages, which of course would not provide Z.T. with the free and appropriate education that she has been denied."); *Kantak*, 1990 WL 36803, at * 2 ("In the court's opinion, defendants' continued deprivation of the service of a teacher of the deaf for Cynthia Kantak, which has been determined to be necessary to best serve her individual educational requirements, would produce a sufficient injury to satisfy the first prong of the preliminary injunction test."); *John T. v. Delaware County Intermediate Unit,* 2000 WL 558582 at *8 (E.D.Pa. May 8, 2000) ("Compensation in money can never atone for deprivation of a meaningful education in an appropriate manner at the appropriate time."); *see also Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.,* 1999 WL 980164, at *4 (S.D.N.Y. Oct. 28, 1999) (observing that Congress was concerned to avoid lengthy administrative appeals during which "the appropriateness of a child's educational placement remains in limbo").

The make-whole approach of compensatory education cannot replace that which a student was entitled to receive in earlier life, but it is a start. However, because education is an on-going continuum which, when broken through interruption, can cause significant set backs, delay in implementing the remedy could make the compensatory education award merely a pyrrhic victory for Brendan.

Even assuming that Brendan is not on the verge of a significant breakthrough, the stipulated facts presented to the IHO and Brendan's 2000–2001 IEP indicate that while at the Perkins School he made improvements far above that in the two years for which the compensatory education was ordered. The latest IEP indicates that he suffers regression just from the summer break and therefore needs twelve month services. His post-secondary education goals in his last IEP indicate that the would "benefit from on-going training and support in order to learn how to operate the power chair and the communication device." The IEP also ruled out "day services" as inadequate to provide the "intense support" and services necessary to meet his needs. Certainly, the "day-hab" he will receive upon completion of his program with school will fall short of this same requirement if he has any hope of obtaining some modicum of independence in movement and communication.

The Court certainly understands that all FAPEs must come to an end and, when that occurs, it may have the consequential effect of ending the continuum of improvement for each student. However, given Brendan's severe physical challenges combined with his age and the IHO's finding that the District failed to provide a FAPE for two years, the basic promise of a chance at being able to independently communicate—which may not present itself if his education is discontinued, more than satisfies the element of irreparable harm. *See Blazejewski v. Bd. of Educ., Allegany Cent. Sch. Dist.,* 560 F.Supp. 701, 703–04 (W.D.N.Y.1983) (finding irreparable injury where student's reading deficiency will be

left without special assistance resulting in "deficient communication skills.")

### 2. "Fair Ground for Litigation"

#### a. Sufficiently serious questions going to the merits

"Where the plaintiff seeks an equitable remedy, the prudent exercise of equitable powers suggests that the Court look at the underlying claim to assure itself that the claim at the heart of the lawsuit is not meritless." *Juzwic*, 891 F.Supp. at 717.

As the Plaintiffs' counsel pointed out at oral argument, the determination of the IHO clearly establishes that there are, at the very least, sufficiently serious questions going to the merits to make a fair ground for litigation. The Defendants argue, however, that the IHO was wrong and that the SRO seldom grants compensatory education, doing so only in extreme situations. Citing State Review Officer decisions, the Defendants assert that "reversal is almost certain." [21]

All of the arguments raised by the Defendants as to the inapplicability of compensatory education in the instant case were made to, and rejected by, the IHO. When a federal court reviews a hearing officer's findings and conclusions on a substantive claim, it must base its decision on a preponderance of the evidence after reviewing the administrative record and, at a party's request, after hearing additional evidence. 20 U.S.C. § 1415(i)(2); *Garro v. Connecticut*, 23 F.3d 734, 736 (2d Cir. 1994). Although in those circumstances the court is instructed to conduct an "independent" review, the right of judicial review is "by no means an invitation to the

courts to substitute their own notions of sound educational policy for those of the school authorities." *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). Rather, those policies should be addressed, narrowed and defined through the administrative process. *See Urban v. Jefferson County Sch. Dist. R–1*, 89 F.3d 720, 724 (10th Cir.1996)("The purpose of the exhaustion rule is to permit agencies to exercise discretion and apply their expertise, to allow the complete development of the record before judicial review, to prevent parties from circumventing the procedures established by Congress, and to avoid unnecessary judicial decisions by giving the agency an opportunity to correct errors.")

Here, the matter before the Court is not whether the IHO was correct but whether Brendan is entitled to educational services while that fight is fought. The Plaintiffs have demonstrated Brendan's claim for compensatory education to the satisfaction of the IHO at the first level of review in the State's two-tier review system.

Inasmuch as the merits of the underlying claim is not now before this Court and given the IHO's decision, it must be assumed that this case represents one of those extreme situations in which compensatory education is warranted—or, at the very least, that the case presents sufficiently serious questions going to the merits to make that question a fair ground for litigation. The Court finds that the Plaintiffs have sustained this element of the preliminary injunction test.

---

**21.** Plaintiffs point out that 8 NYCRR 279.10 provides that the Decision of a State Review Officer "shall not constitute binding precedent in any judicial action or proceeding or administrative appeal in any forum whatsoever." While the Court recognizes that it is not bound by these decisions, the Court nonetheless will review them to aide the determination whether the "substantially serious questions" or the "likelihood of success" prongs of the preliminary injunction test are met.

### b. A balance of hardships tipping decidedly toward the party seeking injunctive relief

The balance of hardships is between Brendan being sent out into the adult world with less than a full education and/or suffering irreparable harm to his education if he prevails in the administrative hearing and eventually recommences his education after the SRO rules, and, the District being forced to pay for the education now pending the administrative appeal, perhaps without the ability to recover such costs if it is successful. Several factors are pertinent to this balancing test.

Congress recognized, in enacting the IDEA, that there would be cost inherent in the implementation of its mandate. Indeed, federal funding is conditioned on compliance with the IDEA. 20 U.S.C. § 1412. The costs to *this* school district in implementing *this* student's education is not, in the Court's view, the lynchpin of this determination. Rather, it is whether the mandate of the IDEA, which affords *all* students a *free appropriate public education*, has been fulfilled. The IHO essentially determined that the District failed in this mandate. Brendan suffered the consequences of this failure and is, therefore, entitled to receive now what he should have received then. The logical conclusion is that if the school district had complied with the IDEA during the two years the IHO found were deficient, it would have incurred the same expenses then that it will incur now. In this sense, the District is the author of this chapter in Brendan's education so it can hardly be said that the balance tips in the District's favor. *See Miener*, 800 F.2d at 753 (compensatory education is consistent with Congress' intent to channel available resources to activities and programs that benefit disabled students) (citing *Smith v. Robinson*, 468 U.S. 992, 1020, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984)).

■ Further, the question is whether school funding of an educational program should be mandated while the administrative appeal proceeds [22] and, thus, is closely akin to a pendency funding issue under the IDEA. The Courts have reviewed the question of recoupment of education costs under pendency and found that these cost are not relevant to the inquiry. *See Schutz* 137 F.Supp.2d at 92 and note 15. Indeed, as Judge Hurd pointed out in *Schutz*, given Congress' clear intention to maintain the educational placement of children during the appeals process via the mandate of Section 1415(j), the "Stay Put" provision will be upheld even if it imposes significant financial burden on the states and school districts that participate in IDEA. *Schutz*, 137 F.Supp.2d at 92 (citing *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993)). This "clear intention," while it may not be directly applicable, is still compelling.

Finally, the District argues that if a preliminary injunction is granted, the decision will create a "dangerous precedent of school districts being forced to provide adult education before state level review." The Court does not see how this is so. This case is limited to its own facts. Further, according to the attorneys at oral argument, a fact scenario similar to this case has not been addressed in a single written decision in either the New York or federal systems. Still further, to avoid a similar situation in the future the District need only zealously comply with the dictates of the IDEA *while* the students are under its auspices.

**22.** For the reasons set forth below, the Courts declines the Plaintiffs' invitation to grant a preliminary injunction which would exceed the SRO's determination.

The Court finds that the balance of hardships tips decidedly in favor of the Plaintiffs. *Juzwic,* 891 F.Supp. at 712–13 ("While the Court may consider cost in making this determination, in this situation cost does not counterbalance the nature of the harm facing K.P.").

*3. "Likelihood of Success on the Merits"*

Given the potential for widely divergent views on whether the District's position is protecting the public interest within a statutory or regulatory scheme,[23] the Court will analyze the case using the "likelihood for success on the merits" prong of the preliminary injunction test in addition to the above. In doing so, the Court rejects the Plaintiffs' argument that the "likelihood of success" determination goes to whether the preliminary injunction will be granted and not to whether the compensatory education award will be sustained. That argument is circular in that the question assumes the answer. Even though the actual substantive issue is not before the Court, to determine whether a preliminary injunction will issue (which will maintain the educational program of the compensatory education award during the appeal of that award), the Court must determine the likelihood of success on the underlying claim.

Here, the Court is faced with a determination by the IHO, issued at the first level of a two-level administrative appeal process, which indicates that Brendan is entitled to two years of compensatory education. The Defendants argue now that the Court cannot afford deference to the IHO's determination where an appeal to the SRO is pending because, under such circumstances, the IHO's determination does not represent an agreement on the placement of the child. The Defendants assert in this regard that before there can be placement under 34 C.F.R. 301.514, there must first be agreement on placement, the latter of which requires a "state level" determination which the IHO's Decision does not constitute. The Defendants further argue that the Plaintiffs cannot establish a likelihood of success on the merits because compensatory education is an exceptional award rarely granted under the SRO's determinations.

The Court is not persuaded that deference cannot be afforded the IHO's determination *in this case.* The parties have already litigated this matter to the IHO. They have raised all of the defenses asserted here and the IHO has had the benefit of viewing all of the witnesses and judging their credibility. The Court understands the distinction made in *Murphy* and argued by the District regarding the due deference afforded a SRO's decision as opposed to the IHO's decision with regard to placement determinations related to pendency. *See Murphy,* 86 F.Supp.2d at

---

**23.** The Court understands the District's position that the costs of Brendan's program are great and that it has an obligation to all of the other children in the school district which may be, in accordance with funding schemes, affected to one degree or another by allocation of funds to this program. The Court recognizes further that during the last four years the District acted in Brendan's best interest by agreeing to send him to the Perkins School despite its cost, that the deficiencies in the past programs as determined by the IHO appeared to have been caused primarily by difficulties in the District's subcontractors implementing otherwise appropriate IEPs, and that the District's present position is not driven by malice or ill will towards Brendan, his family, or the disabled. However, this case does not represent a referendum on legislative funding schemes but rather on the implementation of a Congressionally mandated educational program to this student. The public interest is in insuring that the mandates of the IDEA are enforced.

358 (addressing whether a IHO's determination issued prior to the SRO's review should be given deference under 34 C.F.R. § 300.514(c)[24]). However, here the issue is not one of a change of placement (discussed *supra*), but rather is a matter of continuing Brendan's already agreed upon placement under the IHO's award for compensatory education. In addition, since the IDEA does not apply it would follow that the regulations arising thereunder would not apply.

Further, this is not a case where the Court sits as an adjudicator of the merits on the underlying claim, after administrative exhaustion has run its course, whereby the SRO's decision would necessarily be granted deference over the IHO's decision. To deny deference to the SRO's determination on a case addressed to the merits, or to afford deference to an IHO's decision before SRO review in such a case, would essentially obviate the requirement of exhaustion of administrative remedies through which the Court gains the full benefit of administrative expertise into the issue at bar.

Here, where the issue is not a determination on the merits *per se* but rather whether a temporary remedy should issue, the lower level administrative decision must be afforded deference on issues of status quo, the existence of sufficiently serious questions going to the merits, and

likelihood of success or else there is no record at all for the Court to review. To accept the Defendants' position that deference cannot be afforded until the second level of review essentially ends the inquiry and has the consequential effect of depriving the Court of equitable powers. In addition, it makes the student's age a factor which contravenes Congress' clear intent. Indeed, there can be no argument that a child less than 21 years old who is entitled to continue special education pursuant to an IHO's determination must await the SRO's determination before he or she invokes pendency. As cited above, the courts have recognized that exhaustion of administrative remedies is not required where the relief seeks imposition of the stay-put provision. *See Murphy* 86 F.Supp.2d at 357. The Defendants' position is tantamount to arguing that once a child reaches 21, Congressional intent is meaningless. It would, as is the case with delaying compensatory education, make the remedy illusionary. That result is inappropriate.[25]

Still further, given the underlying finding of irreparable harm in these circumstances, the longer this student is out of school the more compelling the need to rely on the findings of the IHO becomes. As the IHO indicated in the Decision, the underlying hearing took eleven days and

---

**24.** 34 C.F.R. § 300.514(c) states:

> If the decision of a hearing officer in a due process hearing conducted by the SEA or a State review official in an administrative appeal agrees with the child's parents that a change of placement is appropriate, that placement must be treated as an agreement between the State or local agency and the parents for purposes of paragraph (a) of this section [which tracks the stay-put provision].

**25.** Indeed, if the compensatory education question were decided by the SRO in the Plaintiffs' favor, that determination would ap-

pear to satisfy the requirement of "likelihood of success on the merits" thereby alleviating the Plaintiffs' obligation to demonstrate a balance of hardships in their favor. *See A.T.,I.T.,* at * 11 ("By failing to implement the order of the state review officer, defendants have failed to comply with the IDEA's mandate that the state provide a free and appropriate public education.... As a result, Z.T. is not receiving the meaningful benefits to which she is entitled.... Accordingly, I find that plaintiffs have demonstrated a likelihood of success on the merits.").

included thousands of pages of testimony transcript. The IHO, having had the benefit of hearing the testimony and receiving lengthy memoranda of law from the parties (which were provided to this Court as exhibits), still took eight (8) months to render a decision. Equity requires that this Court act expeditiously. Absent deference afforded the IHO's determination, the entire hearing would have to be recreated in this Court on this motion, which, in turn, would delay these proceedings, increase the costs to the parties by requiring them the litigate the merits repeatedly, and effectively mean the Court *is* reviewing the case on the merits.

For the purpose of the preliminary injunction, the Court finds that the IHO's factual determinations must be given appropriate deference.

Addressing the Defendants' argument that compensatory education is rarely granted by the SRO, the Court notes that the Defendants have not asserted that the SRO never grants compensatory education but does so only in extreme cases. The IHO's Decision must be read as an indication that the underlying situation represents one of these extreme cases.

Whether there was some evidence of regression such to sustain the award must be answered in the affirmative by reason of a logical inference. The Defendants' Memorandum of Law provided to the IHO devoted a substantial portion thereof to the argument that prevailing law requires proof of regression and that there existed no evidence of regression to sustain this standard. The IHO's Decision indicates that she reviewed the parties' memoranda as well as the evidentiary material from the lengthy proceeding and then rendered a decision on behalf of the Plaintiffs. The Court must assume that the IHO, who was selected from the District's list of IHOs, was competent to review the matter.

Even assuming, *arguendo,* that regression is required to make out a claim for compensatory education (an issue that the Court does not reach at this time), the Court *must* assume that the IHO found sufficient indicia of regression to support her decision. To *not* assume this factual underpinning at this stage requires this Court to do exactly what the exhaustion requirement was deigned to prevent, namely, conduct a trial on the merits before second level review.

Given the issues before the Court and cases cited above, the Court finds that the Plaintiff has sustained, at this juncture, the burden of demonstrating likelihood of success on the merits. The Court further notes that the limited duration of the relief granted (discussed *infra* ) does not impair or defeat the deference to be afforded the SRO if in fact an appeal is taken beyond the SRO's decision on the merits and further injunctive relief is sought.

### 4. Bond—Rule 65(c)

Plaintiffs argue that the requirement under FED. R. CIV. P. 65(c) that a bond be posted should be waived because the case advances an important public interest. *Pharmaceutical Soc'y of New York, Inc. v. New York State Dept. of Soc. Servs.,* 50 F.3d 1168, 1174–75 (2d Cir.1995) (affirming waiver of bonding requirement where action advanced public interest arising out of comprehensive health or welfare statute.). The Defendants argue that a bond is essential because if a preliminary injunction issues, the school district will be "forced to expend hundreds of thousands of dollars on education costs at Perkins School prior to the decision of the State Review Officer being issued. Once that decision is issued, there will be no practical way for the School District to recoup these funds should the Decision of the hearing examiner be reversed."

The case at bar involves an important public policy interest, namely, the compliance of a school district with the mandates of the IDEA, a vital statute for the education of disabled students in our society. *See John T.*, 2000 WL 558582, at * 8 ("It is in the public interest to provide benefits to those entitled to them under the law."). The IHO has already determined that the school district violated its mandate. But for Brendan's age, he either would be in that program now, pursuant to pendency, or have undergone two years of this education already, all at the District's expense.

This is not a case where a parent has altered the placement agreed upon under the IEP, but rather one which seeks a continuation of placement *because of* a deprivation of Brendan's right to a *free* appropriate public education. It would seem incongruous that parents would have to secure the costs of the remedy for the *free* education that their child was deprived. In addressing the remedy of compensatory education, the Eighth Circuit said, "[w]e are confident that Congress did not intend the child's entitlement to a *free* education to turn upon her parent's ability to 'front' its costs." *Miener v. State of Mo.*, 800 F.2d 749, 753 (8th Cir.1986) (emphasis in original).

Further, the provision in Rule 65(c) that security shall be given "in such sum as the court deems proper" indicates that "the district court is vested with wide discretion in the matter of security." *Ferguson v. Tabah*, 288 F.2d 665, 675 (2d Cir.1961). A district court may dispense with the posting of security entirely where the parties sought to be enjoined or restrained "have not shown that they will likely suffer harm absent the posting of a bond." *Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir.1996); 11A Wright–Miller–Kane, FEDERAL PRACTICE AND PROCEDURE (2d ed.1995) at 293 ("the

court may dispense with security altogether if the grant of an injunction carries no risk of monetary loss to the defendant."). "The district court need not order security in respect of asserted economic damages that are 'speculative at best.'" *Interlink Int'l Financial Servs., Inc. v. Block*, 2001 WL 521813, at * 2 (S.D.N.Y. May 15, 2001) (quoting *Inflight Newspapers, Inc. v. Magazines In–Flight, LLC*, 990 F.Supp. 119, 140 (E.D.N.Y.1997)).

The Defendants have submitted an affidavit setting forth the costs of Brendan's educational plan and an assertion that "the District is facing funding for this student out of local incomes without State or Federal Aid." The affidavit also asserts that without a bond, there will be no way to recoup the costs of implementing Brendan's education if the injunction is granted. It is unclear, however, whether these costs will ultimately constitute a loss to the District. Indeed, as indicated, the costs of administering the IDEA are inherent in its implementation which carries with it avenues for federal and state funding. The conclusory contentions that the district is "facing" funding from local sources and that the costs cannot be "recouped" does not address the availability for IDEA funding for Brendan, albeit not classified as "aid," or the ability to shift the responsibility for Brendan's program to another public entity. *See Board of Educ. of Oak Park & River Forest H.S., Dist. 200 v. Illinois State Bd. of Educ.*, 10 F.Supp.2d 971, 978–80 (N.D.Ill.1998)(collecting cases indicating that under IDEA, state educational agency, as opposed to school district, may ultimately be held responsible for costs of pendency education).

Further, it is also worth mentioning, but not dispositive, that the Defendants have not directed the Court to any authority indicating that they would be entitled to recover such costs from the Plaintiffs even

if a bond were posted. *See Schutz*, 137 F.Supp.2d at 91, n. 15 ("Accordingly, it appears as though the tuition payments made by the District during the pendency of this appeal may not be subject to recoupment from the Schutzes, and no opinion is offered as to the manner in which this burden might be allocated between the District and the State."). If this right does not exist, the bonding requirement would simply be an additional and unnecessary burden the Plaintiffs would have to shoulder to acquire their son's entitlement to a free education.

The Court finds, in this context, that the equities require an exception to the bonding requirement. Given Congress' clear intention to maintain the status quo during appeals, and given further the findings of the IHO determining deprivations of the IDEA's dictate justifying two years of compensatory education, a bonding requirement could have the effect of making the remedy equally as illusionary as a delay in instituting the educational program. The Court expresses no opinion on whether such costs are recoverable if the SRO and/or any Court ultimately determines that this is not a case in which a compensatory education should be granted.

## III. CONCLUSION

Based upon the above, the Court hereby **GRANTS** the Plaintiffs' motion for a Preliminary Injunction **IN PART,** and it is hereby **ORDERED** that the Defendants shall immediately implement the decision of Impartial Hearing Officer Tia Schneider Deneberg in *The Matter of an Educationally Disabled Student, Brendan Cosgrove, by his parents, Robert and Janice Cosgrove and The Board of Education of the Niskayuna Central School District,* dated June 4, 2001 and place plaintiff Brendan Cosgrove at the Perkins School in Water-

town, Massachusetts for educational purposes, and, further, the Defendants shall make whatever financial arrangements are necessary to allow Brendan to be so enrolled at the Perkins School, retroactive to June 25, 2001, and, further, the Defendants are hereby **ENJOINED** from suspending, terminating, or altering such educational services until such time as a final determination has been rendered by the New York State Review Officer on the merits of any appeal taken from the June 4, 2001 written findings of fact and decision of Impartial Hearing Officer Tia Schneider Deneberg in *The Matter of an Educationally Disabled Student, Brendan Cosgrove, by his parents, Robert and Janice Cosgrove and The Board of Education of the Niskayuna Central School District,* or until the expiration of the award granted by the Impartial Hearing Officer's decision, whichever shall occur first. The Court **DENIES** that much of the motion seeking a preliminary injunction requiring such educational services to continue at public expense beyond the final determination of the State Review Officer of the merits on the afore-mentioned appeal. Given the arguments of the parties and the avenues for appeal from the State Review Officer's determination, the court to which such an appeal will be taken will be in the best position to weigh the merits of any further request for injunctive relief which, at this time, is merely speculative and therefore not ripe for adjudication.

**IT IS SO ORDERED.**