Alba SOMOZA, Plaintiff,

v.

NEW YORK CITY DEPARTMENT
OF EDUCATION, Defendant.

No. 06 CV 5025(VM).

United States District Court,
S.D. New York.

Feb. 21, 2007.

Anthony N. Michael, Kaye Scholer, LLP (NYC), New York, NY, for Plainitff.

Janice Louise Birnbaum, New York City Law Depart. Office of the Corporation Counsel, New York, NY, for Defendant.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Alba Somoza ("Somoza") brought this case against defendant New York City Department of Education (the "DOE") alleging that she was denied a free appropriate public education, to which she is entitled under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. (the "IDEA" or the "Act"), and Article 89 of the New York State Education Law. The Court conducted a three-day bench trial to determine whether, in fact, Somoza was denied a free appropriate public education, or whether, as the DOE contends, her claims are barred either by the statute of limitations or by a settlement agreement signed by her mother, Mary Somoza ("Mary Somoza"). For the reasons described below, the Court finds that Somoza's claims are not barred by the statute of limitations or the settlement agreement, and it remands the matter to the DOE's Impartial Hearing Office for a ruling on the merits of Somoza's claims.

## I. BACKGROUND

### A. FACTS[1]

Somoza was born on December 19, 1983. She suffers from cerebral palsy, from

---

1. The factual summary that follows derives primarily from the complaint, the answer, the parties' pretrial submissions, the transcript ("Trial Tr.") of the testimony recorded in the Court's trial on November 20–22, 2006 and December 18, 2006, the evidence admitted at trial ("Trial Exs."), and the administrative record ("A.R."). Except where specifically referenced, no further citation to these sources will be made.

which she has been severely disabled since birth. She is non-ambulatory, has limited motor control of her arms, legs, and head, and is unable to speak. As a result, she requires assistance in all daily life activities. She communicates through the use of assistive technology devices, which she operates using a switch installed in the headrest of her wheelchair. Somoza's twin sister, Anastasia Somoza ("Anastasia"), suffers from a less severe case of cerebral palsy, which allows her to speak and use her hands.

Somoza entered New York City public schools at PS 234 in 1989. For the first three years of her education, she was placed in a segregated classroom program for students with a wide variety of different disabilities, including cerebral palsy, Down syndrome, emotional disturbances, and mental retardation.

In September, 1991, at the direction of the DOE, Somoza was evaluated by Dr. Andrea Blau ("Blau"), an expert in the field of special education. Blau's report, prepared at the time, indicates that Somoza had "normal to above normal cognitive functioning" and that she understood both English and Spanish. However, she was not effectively using her communication device to express herself, in part because of a lack of available trained personnel at her school. As a result, her ability to express herself was largely limited to gesturing. Blau's report concluded: "Alba's ability to achieve her academic potential will depend to a large degree upon her developing age appropriate language and literacy skills. She appears to have the capacity to acquire these skills but due to the constellation of challenges she faces it will require a unique and intensive intervention approach. Technology based intervention is essential." (Trial Ex. 17.)

In the spring of 1993, Somoza, then nine years old and enrolled in the third grade at PS 234, was again evaluated by Blau

and other experts at the direction of the DOE following a request by Mary Somoza. According to the assessment of Somoza's educational skills, she performed at a first grade level in most areas, including reading, writing, and mathematics. Blau concluded at that time that "Alba requires intensive tutoring and very specific curriculum adaptations to facilitate both her literacy skills acquisition and her ability to receive an appropriate education." (Trial Ex. 26.) Blau's report called for a greater use of assistive technology, some of which was available at the school but not being used in Somoza's classroom. (*See id.*) Both Blau and Mary Somoza testified that these recommendations were not implemented by the DOE. (*See* Trial Tr. at 77, 410.)

In an accompanying assessment of Somoza's speech and language skills, Blau noted that she tested above average for her age in receptive language skills, a performance that Blau described as "extremely impressive for a bi-lingual child, especially for a child with such a severe speech impairment." (Trial Ex. 25.) Somoza's expressive language skills, on the other hand, were more limited, due in large part to her inexperience with her communication devices. Other comments by Blau portrayed Somoza in 1993 as a person with an active mind and a strong desire to improve her communication skills so that she might better express her thoughts to those around her. Blau remarked that Somoza "strives for independence," and that "[r]arely does she come in contact with a person who does not recognize her cognitive potential." (*Id.*) "Quite unique," wrote Blau, "is Alba's ability to convey her intellectual spark despite her extreme communicational challenges." (*Id.*)

As another aspect of the 1993 assessment, Somoza was given an intelligence test, the Columbia Mental Maturity Scale, on which she received a score of 132, plac-

ing her in the 97th percentile of her age group with respect to general reasoning ability and further indicating strong intellectual promise despite her physical disabilities.

In the fall of 1993, Somoza was transferred into a regular classroom at PS 234 for the fourth grade. This transfer came after Mary Somoza requested an impartial hearing with the aim of removing Somoza from the segregated classroom, where, in her opinion, her daughter "was completely not being educated." (*See* Trial Tr. at 406, 474.) According to the complaint, this placement in a regular classroom was obtained through the indirect assistance of President Clinton, who had taken an interest in Somoza's case. (*See* First Am. Compl. at ¶ 28.) Mary Somoza did not believe that her daughter belonged in the fourth grade and requested that she be held back a year, but this request was denied.

From 1996 to 2002, Somoza attended secondary school at the School of the Future, a New York City public school that provides both regular and special education. Mary Somoza chose this school in part because it embraced the use of technology in the classroom. Somoza was placed in an "inclusion program," which means that she attended a regular classroom and followed the general education curriculum, as opposed to one limited to children with disabilities. Elizabeth Proano ("Proano"), a special education teacher at the school who worked exclusively with Somoza and Anastasia, provided support to Somoza in her classes and adapted the general education curriculum so that she could participate in it. For example, when the curriculum for the entire class involved memorizing the countries in Africa, Somoza's assignment was limited to the memorization of six of them. (*See* Trial Tr. at 371–72.) When the rest of the class learned chemistry, Somoza was asked to memorize "something from the element table." (*Id.* at 387.)

Even this simplification of the general education curriculum tailored for Somoza appears to have been performed inconsistently, and it was a point of debate at the trial whether Somoza's assignments at the School of the Future were consistently appropriate to her level of academic ability. Examples are suggested by entries in Somoza's eleventh grade homework notebook made by her teachers recording the content of lessons and assignments covered as part of Somoza's curriculum during that school year. (*See* Trial Ex. 50.) Mary Somoza testified that the homework book included assignments that were "physics, chemistry, and topics that Alba could absolutely under no circumstances complete." (*See* Trial Tr. at 418.)[2] Thus, much evi-

---

2. Curious examples from Somoza's eleventh grade homework notebook include an assignment related to the electron configurations of the atoms of several elements, for example:

 

$$F =$$

1s 2s 2p$_x$ 2p$_y$ 2p$_z$

(*See* Trial Ex. 50 at 1191.) Another entry dated September 18, 2000, presumably at the beginning of the school year, contained algebraic formulas and problems such as: "Graph, find the vertex, and label the roots of each: (1) $y = 2(x-1)^2 + 3$; (2) $y = -5 (x+2)^2 -1$; (3) $y = -5 (x+1)^2-2$; (4) $y = x^2-6x+9$." (*See id.* at 1174.) Questioned about the meaning of these entries in the context of Somoza's education and her ability to understand them, Proano did not provide an adequate explanation, suggesting that perhaps they might have been meant for Anastasia, but not clarifying why the assignments ap-

dence in the record suggests that school officials did not customize the "unique and intensive intervention approach" specifically geared towards reaching a particular set of academic goals to develop Somoza's "age appropriate language and literacy skills" that Blau had recommended as essential to Somoza's education in 1991. (Trial Ex. 17.) Rather, her teachers instead attempted to adapt, on an ad hoc basis, material from the regular high school curriculum that seemed manifestly well beyond Somoza's academic level simply by lowering its level of difficulty and removing large and meaningful portions of its substantive content.

Blau testified that although a reduction in the amount of work might have been necessary in Somoza's case, primarily because of the fatigue prolonged effort caused Somoza, proper adaptation of a curriculum to address Somoza's unique educational challenges and needs also required more extensive modification of the basic literacy lessons so as to allow Somoza to benefit from the content of other aspects of the academic curriculum. (*See id.* at 508.) Blau concluded that during the six-year period that Somoza attended the School of the Future, she lacked "a truly customized approach." (*See id.* at 516.)

Perhaps because Somoza's assignments were not always academically appropriate for her, the evidence also suggests that her teachers and tutors, undoubtedly motivated by the most sincere empathetic intentions, played a large role in completing them. For example, Yuichi Tamano ("Tamano"), Somoza's assistive technology consultant during Somoza's last two years at the School of the Future, testified that he actually did most of the work for Somoza's final project in 2002. (*See id.* at 232–34.)

Somoza's reaction to her educational situation was to communicate extreme frus-

tration with the extent to which her expressive communication skills lagged her curiosity, desire to learn, and innate mental ability. Tamano testified that Somoza became increasingly frustrated over time as she became less able to participate in the regular curriculum. (*See id.* at 225.) Mary Somoza recounted that Somoza's frustration manifested itself in outbursts of anger and prolonged, inconsolable crying. (*See id.* at 424–25.)

In June, 2002, Somoza completed the twelfth grade and graduated from the School of the Future. She was awarded a Regent's Diploma with honors. In her complaint in this action, she claims that the diploma was a sham, and that her school reports indicate that her academic abilities even in basic subjects were well below the level of a high school student. In fact, a school report prepared just weeks before her graduation indicates that Somoza's listening comprehension skills were at a first grade level, her writing skills were at a fourth grade level, and her mathematical problem solving skills were at a kindergarten to first grade level. (*See* Trial Ex. 54.) None of Somoza's reports suggests that she was scheduled to receive a diploma, much less a Regent's Diploma with honors. The complaint notes that President Clinton attended and participated in the graduation ceremony of Somoza and Anastasia, and suggests that his expressed public interest in the educational experience of the Somoza twins may have been a motivation for the DOE's exceptional treatment of Somoza at graduation. (*See* First Am. Compl. at ¶ 28.) The DOE does not explicitly concede any irregularity with respect to the granting of a diploma to Somoza, but it did continue to provide education services to her after graduation, even though its obligation to do so generally ends with the awarding of a diploma.

peared in Somoza's homework notebook.

(*See* Trial Tr. at 382.)

In July, 2002, Somoza began attending the District 75 inclusion program at Queens College. Over the next few months, Mary Somoza registered numerous complaints regarding Somoza's treatment in that program as well as the suitability of the educational plan to her daughter's school needs. In particular, the program was geared towards ambulatory but mentally retarded students, rather than non-ambulatory students with normal intelligence. Additionally, the vocational education selected for Somoza called for her to be trained as a messenger, a choice that Mary Somoza considered manifestly inappropriate for someone with Somoza's combination of disabilities—a view later expressed by Blau as well. By letter dated September 24, 2002, Mary Somoza detailed her objections to the Queens College program to Susan Erber ("Erber"), Superintendent of District 75. (*See* Trial Ex. CCCC.) Erber was responsive to Mary Somoza's arguments, and in November, 2002, the DOE authorized Blau to review Somoza's case and to develop and implement a customized educational program for her. Blau testified that she was appalled when she read Somoza's 2002 school report because it indicated that she had not made any significant improvement since Blau's 1993 educational assessment of Somoza. (*See* Trial Tr. at 56.) Blau developed a comprehensive educational program for Somoza (the "Blau Program"), and in November 2002, the DOE began funding that program. Somoza has participated in the Blau Program continuously since that time, at a cost of approximately $400,000 per year. It is her continued participation in that program that is at issue in this case.

The Blau Program includes, among other things, a full-time teacher, full-time paraprofessional, transportation, and assistive technology. The program makes extensive use of computer technology, and it employs a teaching methodology that focuses on improving Somoza's ability to communicate and to access her academic materials independently. To facilitate these goals, Somoza now uses a laptop computer that is loaded with specialized software and mounted to her wheelchair as her primary communication device.

By all accounts, Somoza's communication skills have improved dramatically in her four years in the Blau Program. Whereas she could previously construct only very simple sentences, she can now form complex sentence structures, and she exhibits improved grammar and a more sophisticated vocabulary. For the first time, Somoza has the skills and technology to independently read books, send and receive emails, and initiate telephone calls. Mary Somoza testified that the improvement in her daughter's ability to express her thoughts has given her a sense of control over her life, and it has alleviated the intense sense of frustration and emotional outbursts that she previously experienced. (*See id.* at 437.) Mary Somoza also testified that soon after beginning in the Blau Program, Somoza started to independently express her feelings to her using her communication device, something she was previously incapable of doing, and that she now goes so far as to initiate conversations with people she meets in public. (*See id.* at 436–37.) Blau testified that Somoza has demonstrated a joy of learning, a willingness to work hard, and an overall sense of optimism toward her education. (*See id.* at 111–12.)

According to Mary Somoza, Blau, and other evidence on the record, over the past few years, Somoza has developed an ambitious vocational plan for herself—to become an artist and a museum docent—and she appears to be making progress toward reaching her goals. With assistance, Somoza can create abstract paintings despite

her limited motor control by requesting different colors of paint and directing changes in how the canvas is positioned in front of her. (*See* Trial Ex. 144.) Blau testified that Somoza has visited galleries and is learning how to put on an exhibition and sell her art. (*See* Trial Tr. at 127.) As to docenting, Somoza is taking classes in art history and communication; she is participating in an internship at the Metropolitan Museum of Art, and she was able to lead a tour for a group from United Cerebral Palsy, despite considerable difficulties. (*See id.* at 124.)

Somoza's rapid improvements since beginning the Blau Program also raise the obvious questions as to whether the methods and technologies being used in that program were known and available to the DOE prior to 2002, and if so, why they were not employed by the DOE as part of Somoza's educational program at the School of the Future, or even before. Blau testified that the methods and technologies used in the Blau Program were widely available during the time period that Somoza attended the School of the Future. (*See id.* at 509–17.) According to Blau, there were hundreds of children in New York City with disabilities comparable to Somoza's, many of whom were receiving these services and obtaining positive results. (*See id.* at 527–28.) Tamano agreed that the technology was available, albeit with earlier versions of the software, but he testified that he did not believe that Blau's teaching methods were widely known. (*See id.* at 290–92.) A corollary threshold inquiry these circumstances raise is whether, given Somoza's demonstrated intelligence and intense desire for meaningful education, the learning programs she was actually provided were adequately suited to her needs.

Blau further stated that she had, in fact, recommended a number of the Blau Program's technologies and practices in the report she prepared for Somoza in 1993, but that the DOE failed to apply them to her educational program. (*See id.* at 528, 77.) The testimony of Proano, who reviewed Somoza's file when she began at the School of the Future, suggests that she did not read the entire file, and she stated that she did not recall ever having seen Blau's reports. (*See id.* at 368.) Although Proano readily acknowledged that Somoza presented a unique set of challenges for an educator, her testimony did not demonstrate that she went far in seeking out ways of overcoming those challenges by means of the uniquely customized and intensive intervention Blau had proposed years earlier. When asked whether she had considered that there might be professionals outside the DOE who had developed methods for teaching children as disabled as Somoza, Proano responded simply, "I taught Alba what I was given to teach her." (*Id.* at 361–62.) Proano stated that in her opinion, Somoza "accomplished as much as she could within the constraints of the School of the Future and the curriculum that we had to follow." (*Id.* at 360.)

On December 19, 2004, Somoza turned twenty-one years old, and her right to receive educational services under the IDEA was set to expire at the end of the 2004–2005 school year. Mary Somoza testified that it was her understanding that if Somoza had been born two weeks later (*i.e.*, in January, 1984 instead of December, 1983), she would have been entitled to educational services through the 2005–2006 school year. (*See id.* at 440.) Mary Somoza further testified, however, that the DOE often granted "age waivers" for students whose birthdays fall close to the end of the year, allowing them one additional year of schooling. (*See id.*) Mary Somoza met with Deputy Chancellor Carmen Fariña ("Fariña") and requested such an age waiver for her daughter. Following this

meeting, in what she characterized as an act motivated by a desire to provide "compassionate education" for Somoza (Trial Tr. at 565), Fariña mailed Mary Somoza a document entitled "Stipulation of Settlement and Discontinuance" (the "Stipulation") along with a cover letter dated January 7, 2005. (*See* Trial Ex. 91.) The Stipulation indicates that the DOE agreed to fund the Blau Program through the 2005–2006 school year, and it contains a section releasing the DOE from any legal claims that Somoza might have against it. Mary Somoza signed the Stipulation and returned it to Fariña with a cover letter dated January 21, 2005.[3] (*See* Trial Ex. 92.)

In early 2006, Mary Somoza made another request for an extension of the Blau Program. By letter dated January 25, 2006, perhaps sensing that at this point in their relationship good intentions collided with bad faith, and that Mary Somoza was taking advantage of the DOE's generosity, Fariña denied that request. (*See* Trial Ex. 117.)

## B. *PROCEDURAL HISTORY*

Somoza requested an impartial hearing on March 29, 2006, seeking the continuation of the Blau Program for an additional two years in compensation for DOE's allegedly denying her an appropriate public education from kindergarten through high school. That hearing took place on May 30, 2006 and June 9, 2006. The impartial hearing officer (the "IHO") issued a decision on June 26, 2006, in which he granted the DOE's motion to dismiss based on his determination that the Stipulation is binding and bars Somoza's claims. (*See* Deci-

sion of Impartial Hearing, Case # 104375, attached as Ex. 8 to A.R.)

On June 29, 2006, Somoza filed a complaint in this Court requesting that the DOE be enjoined from terminating its funding of the Blau Program, which was scheduled to conclude the next day. Somoza also sought a temporary restraining order ("TRO") to ensure that the DOE would continue to fund the Blau Program pending a hearing on her request for a preliminary injunction. The Court granted the request for a TRO. *See Somoza v. New York City Dept. of Educ.*, 2006 WL 1981758 (S.D.N.Y. July 10, 2006). A preliminary injunction hearing was subsequently conducted before Judge Richard J. Holwell of this Court. On July 20, 2006, Judge Holwell granted a preliminary injunction pending Somoza's appeal of the IHO's decision to the Office of State Review.

On July 31, 2006, Somoza filed a petition appealing the decision of the IHO, arguing that he had erred in finding the Stipulation valid and enforceable. The state review officer ("SRO") issued his decision on August 30, 2006, dismissing the appeal. The SRO found it unnecessary to address the enforceability of the Stipulation because he determined that Somoza's claims are barred by the statute of limitations. (*See* Decision of SRO, No. 06–086, attached as Ex. 14 to A.R.)

On September 15, 2006, this Court granted a motion brought by Somoza to extend the preliminary injunction until a determination was reached to resolve the merits of the claims she asserts in her complaint. The Court held a bench trial

---

**3.** Mary Somoza's cover letter is actually dated January 21, 2004, but both parties stipulate that this date reflects a typographical error and that the letter should have been dated January 21, 2005. It was received by the DOE on January 25, 2005, and Mary Somoza's notarized signature on the Stipulation indicates that she signed that document on January 20, 2005.

on November 20–22, 2006, with closing arguments made on December 18, 2006.

## II. *DISCUSSION*

### A. *LEGAL FRAMEWORK OF THE IDEA*

The IDEA is "an ambitious federal effort to promote the education of handicapped children." *Board of Educ. v. Rowley,* 458 U.S. 176, 179, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The Act reflects Congress's determination that:

> Disability is a natural part of the human experience and in no way diminishes the right of individuals to participate in or contribute to society. Improving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities.

20 U.S.C. § 1400(c)(1). With these goals in mind, the Act "provides federal money to assist state and local agencies in educating handicapped children, and conditions such funding upon a State's compliance with extensive goals and procedures." *Rowley,* 458 U.S. at 179, 102 S.Ct. 3034.

In particular, the IDEA requires that "all children with disabilities residing in the State between the ages of 3 and 21" be provided a "free appropriate public education" (a "FAPE"). 20 U.S.C. § 1412(a)(1)(A). The statute defines a FAPE to mean special education and related services that (1) are provided at public expense, (2) meet state educational standards, (3) include preschool, elementary school, or secondary school education, and (4) are provided in conformity with an individualized education program. *See* 20 U.S.C. § 1401(9). The individualized education program (the "IEP") has been described as the "'centerpiece' of the IDEA's education delivery system." *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.,* 297 F.3d 195, 197 (2d Cir.2002) (*quoting Honig v. Doe,* 484 U.S. 305, 311, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988)). The IEP, which is "the result of collaborations between parents, educators, and representatives of the school district, 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'" *Id.*

States receiving federal funds pursuant to the IDEA are also required to establish certain procedures "to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision" of a FAPE. 20 U.S.C. § 1415(a). Chief among these procedural safeguards is the "opportunity for any party to present a complaint with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A). The Act specifies that the state must conduct an "impartial due process hearing," and that "any party aggrieved by the findings and decision rendered in such a hearing may appeal such findings and decision to the State educational agency." 20 U.S.C. §§ 1415(f), 1415(g).

The IDEA further provides that, after an impartial hearing and an appeal to the state agency, a party "shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States." 20 U.S.C. § 1415(i)(2)(A). The Act states that in such a civil action, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party;

and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C); *see also Grim v. Rhinebeck Cent. Sch. Dist.,* 346 F.3d 377, 380 (2d Cir.2003).

The Supreme Court has interpreted the statutory language to mean that the agency's rulings are subject to an "independent" judicial review by the district court. *Rowley,* 458 U.S. at 205, 102 S.Ct. 3034; *see also Lillbask ex rel. Mauclaire v. State of Conn. Dept. of Educ.,* 397 F.3d 77, 82 (2d Cir.2005); *Walczak v. Florida Union Free Sch. Dist.,* 142 F.3d 119, 129 (2d Cir.1998); 33 Charles A. Wright & Charles H. Koch, *Federal Practice & Procedure* § 8332 (citing the IDEA as an example of an enabling act that requires de novo review). "The Supreme Court has cautioned, however, that this 'independent' review 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review.'" *Walczak,* 142 F.3d at 129 (*quoting Rowley,* 458 U.S. at 206, 102 S.Ct. 3034). Accordingly, district courts are expected to give "due weight" to the findings of the administrative agency, "mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.,* 226 F.3d 60, 66 (2d Cir.2000) (*quoting Rowley,* 458 U.S. at 208, 102 S.Ct. 3034) (further internal quotation marks omitted). However, district courts need not give any weight to decisions of state administrative agencies with respect to issues of law, "namely, the proper interpretation of the federal statute and its requirements." *Mrs. B. v. Milford Bd. of Educ.,* 103 F.3d 1114, 1122 (2d Cir.1997).

## B. *STATUTE OF LIMITATIONS*

Prior to 2005, the IDEA was silent with respect to the applicable limitations period, and courts applied the "most appropriate or analogous state statute of limitations." *M.D. v. Southington Bd. of Educ.,* 334 F.3d 217, 221–22 (2d Cir.2003) (*quoting Goodman v. Lukens Steel Co.,* 482 U.S. 656, 660, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987)). The DOE asserts that the appropriate limitations period prior to 2005 is one year. The case law indicates that federal courts in New York tended to apply a three-year statute of limitations for a variety of claims made pursuant to the IDEA. *See, e.g., Green v. City of New York,* 438 F.Supp.2d 111, 125 (E.D.N.Y.2006) (denial of FAPE); *Butler v. South Glens Falls Cent. Sch. Dist.,* 106 F.Supp.2d 414, 418, (N.D.N.Y.2000) (failure to comply with procedural safeguards); *Brooklyn Sch. for Special Children v. Crew,* 1997 WL 539775, *12 (S.D.N.Y. August 28, 1997) (reimbursement procedures); *Robert D. v. Sobel,* 688 F.Supp. 861, 864 (S.D.N.Y.1988) (attorney's fees).

As to when a cause of action accrues, the Second Circuit has held that "[e]ven where a federal court borrows a state statute of limitations, '[f]ederal law governs the question of when a federal claim accrues.' Under federal law, a cause of action generally accrues 'when the plaintiff knows or has reason to know of the injury that is the basis of the action.'" *Southington Bd. of Educ.,* 334 F.3d at 221–22 (*quoting Leon v. Murphy,* 988 F.2d 303, 309 (2d Cir.1993)).

The IDEA was amended in 2005 to include two sections that specify a time limit for requesting an impartial due process hearing. The amendment also added explicit accrual language. Section 1415(f)(3)(C) states that a party must request an impartial hearing within two years of the date the party "knew or

should have known about the alleged action that forms the basis of the complaint," unless a state time limitation exists. Section 1415(b)(6)(B) contains similar language. New York state law was also modified in 2005, and it now contains language identical to § 1415(b)(6)(B).[4] *See* N.Y. Educ. Law § 4401(1)(a).

■ The Court need not decide which limitations period applies in this case because it finds that Somoza's claims are not time-barred under any of the limitations periods that might be applicable.

The first step in analyzing whether Somoza's claims are time-barred is to determine when Mary Somoza knew or should have known about the alleged IDEA violation. Assuming, strictly for this purpose, that the DOE failed to provide a FAPE to Somoza prior to the time that she began the Blau Program in 2002, then the Court may conclude that, at the latest, Mary Somoza knew or should have known about that failure when she observed the vast improvement in Somoza's abilities that allegedly occurred shortly after she began in the Blau Progam. Mary Somoza stated at trial that in the first year of the Blau Program, she noticed "[e]xtraordinary improvements and improvements that it took me twenty years to actually believe could be possible." (Trial Tr. at 435.) The SRO concluded that Mary Somoza "was undisputedly on notice no later than the 2002–2003 school year," when Blau determined that Somoza had been denied a FAPE, and the DOE argues that "at the latest, plaintiff's parents knew or should have known from some point in 2003 of the difference between the Blau Program and the alleged

substandard educational program purportedly received by plaintiff for years before the Blau Program." (Decision of SRO, No. 06–086, attached as Ex. 14 to A.R., at 8; Def.'s Pretrial Mem. at 8.) *See also K.P. v. Juzwic,* 891 F.Supp. 703, 716–717 (D.Conn.1995) ("This action did not accrue until K.P.'s substantial gains at Brown–Sullivan indicated that he had the capacity to develop life skills, and vocational skills and attain academic goals previously thought impossible.").

The DOE argued at trial that Mary Somoza should have known about any failure to provide a FAPE at an earlier date because she was closely involved in her daughter's education and because she was involved in several organizations as an advocate for the rights of disabled children. The Court is not persuaded by this argument. Neither Mary Somoza's attention to her daughter's education nor her activities as an advocate for disabled children implies that she should have detected the alleged failure to provide her daughter a FAPE. To find that it does would impermissibly shift the burden of performing an expert evaluation of Somoza's special education program from the DOE to Mary Somoza. Prior to the 2002–2003 school year Mary Somoza may have known at best that Somoza had not made age appropriate progress in her schooling up to that point. But there was no reliable baseline or reference point by which she could assess whether in fact proven interventions existed that could have productively addressed Somoza's unique needs and challenges, or indeed whether Somoza had suf-

---

**4.** Section 1415(b)(6)(B) and the New York provision provide that a complaint brought in an impartial hearing must set forth "an alleged violation that occurred not more than two years before the date the parent or public agency knew or should have known about the alleged action that forms the basis for the complaint...." Read strictly, this language actually places no constraint whatsoever with regard to when a complaint must be filed, requiring only that the parent or public agency knew or should have known of the violation within two years of the violation. Most likely, however, it was intended to provide the same two-year limitation as § 1415(f)(3)(C).

ficient learning or motor skills to respond adequately to any available technology and special programs. These questions were not answered until Somoza obtained the benefits of the Blau Program long enough to produce evidence that the education she had previously received had not yielded comparable results, and hence may not have been sufficiently appropriate for her circumstances.

Consequently, the Court finds that Mary Somoza knew or should have known of the alleged violation of the IDEA at some time during the 2002–2003 school year. It was only then that Mary Somoza observed her daughter's rapid improvement in the Blau Program and that Blau, an expert in the field of special education, expressed the opinion that she had not previously received a FAPE.

Somoza argues that her claims were not ripe at that time because the DOE had voluntarily begun to fund the Blau Program. The Court agrees that Somoza did not have a justiciable claim at that time. A fundamental limitation on the subject matter jurisdiction of federal courts is the requirement of a case or controversy between parties. *See* U.S. Const. art. III, § 2. As the Supreme Court has stated, "[t]he constitutional power of federal courts cannot be defined, and indeed has no substance, without reference to the necessity 'to adjudge the legal rights of litigants in actual controversies.'" *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (*quoting Liverpool S.S. Co. v. Commissioners of Emigration*, 113 U.S. 33, 39, 5 S.Ct. 352, 28 L.Ed. 899 (1885)).

From the fall of 2002 through the spring of 2006, there was no justiciable controversy between the parties because, by funding the Blau Program, the DOE was providing Somoza with precisely the remedy that she would otherwise have sought at an impartial hearing. It was not known how long the DOE would continue to fund the Blau Program or how long Somoza would need to remain in it to compensate for any alleged IDEA violation. It was entirely possible, therefore, that Somoza would not need to remain in the Blau Program any longer than the DOE would be willing to fund it. Consequently, an actual controversy did not fully ripen until early in 2006, when it became clear to Mary Somoza that her daughter needed to remain in the Blau Program beyond June, 2006 and that the DOE would not continue to fund it past that time.

■ The Supreme Court has held that it would be "inconsistent with basic limitations principles" for a limitations period to commence before a party may file suit. *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 200, 118 S.Ct. 542, 139 L.Ed.2d 553 (1997). In *Bay Area Laundry*, the Court applied "the standard rule that the limitations period commences when the plaintiff has 'a complete and present cause of action,'" and it stated that "[u]nless Congress has told us otherwise in the legislation at issue, a cause of action does not become 'complete and present' for limitations purposes until the plaintiff can file suit and obtain relief." *Id.*, 522 U.S. at 201, 118 S.Ct. 542 (*quoting Rawlings v. Ray*, 312 U.S. 96, 98, 61 S.Ct. 473, 85 L.Ed. 605 (1941)); *see also TRW Inc. v. Andrews*, 534 U.S. 19, 34 n. 6, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) ("The question presented in *Bay Area Laundry* was whether a statute of limitations could commence to run on one day while the right to sue ripened on a later day. We answered that question … 'no,' unless the statute indicates otherwise."); *Polanco v. U.S. Drug Enforcement Admin.*, 158 F.3d 647, 654 (2d Cir.1998). As with the statute at issue in *Bay Area Laundry*, there is no

clear indication in the IDEA that Congress intended for the limitations period to begin running prior to the time that a party could file a complaint.

Applying a different rule for IDEA claims would not only be at odds with "basic limitations principles," but would also produce unfair and undesirable results in cases such as the present one, where the school system voluntarily provides the services sought by the student. If the limitations period begins to run before the student has a justiciable claim, the school system could avoid suits for compensatory education simply by providing it for the duration of the limitations period, after which time the suit would be time-barred. To avoid this fate, the student would be compelled to find a way to bring a claim and seek an impartial hearing, notwithstanding the apparent lack of a case or controversy. Such a policy would completely undermine the ability of parties to work together amicably in finding solutions.

■ It should be noted that in a typical IDEA case, no constitutional barrier to a party's ability to bring a suit will be present, and the general rule that the limitations period begins to run when the party knows or should have known of the alleged violation will apply. The issue of justiciability arises only in exceptional circumstances, such as the present case, and it is only in these presumably rare cases that the statutory accrual provision must be interpreted in light of constitutional constraints on federal court jurisdiction.

The Court concludes that in the present case the statute of limitations did not begin to run until early in 2006, when it became clear to Somoza's parents that the DOE would not provide what they considered to be adequate compensatory education. Only then was there a justiciable controversy between Somoza and the DOE. Because the complaint was filed in March, 2006, Somoza's claims are not time-barred under any of the limitations periods that might be applicable in this case.

## C. *SETTLEMENT AGREEMENT*

■ The parties have argued extensively with respect to whether Somoza's right to a FAPE may be waived. The Court recognizes that unresolved issues of law might exist as to the circumstances under which a student may prospectively waive this right. However, as the DOE points out in its pretrial memorandum of law, the Court is confronted in this case with a different legal question—*i.e.,* whether a party may, in the context of a settlement agreement, waive a claim it might have for a denial of a FAPE that occurred *prior* to the execution of that agreement. (*See* Def.'s Pretrial Mem. at 13.) As to this question, it is clear that where there is a dispute between parties arising out of an alleged IDEA violation, those parties are free to reach a settlement agreement that accommodates their respective interests. Such agreements are encouraged by the IDEA and have been upheld by courts. *See* 20 U.S.C. § 1415(e); *see, e.g., D.R. by M.R. v. East Brunswick Bd. of Educ.,* 109 F.3d 896, 901 (3rd Cir.1997) (upholding settlement agreement and expressing concern that "a decision that would allow parents to void settlement agreements when they become unpalatable would work a significant deterrence contrary to the federal policy of encouraging settlement agreements.").

■ Notwithstanding the general enforceability of agreements settling IDEA claims, a court confronted with questions regarding the validity of such an agreement must take into account that it involves the waiver of a vital civil right. Recognizing this essential interest, the Third Circuit has held that the standards applicable to reviewing the validity of a waiver of a civil rights claim, rather than

general contract principles, apply to the interpretation of a settlement of claims under the IDEA. *See W.B. v. Matula,* 67 F.3d 484 (3rd Cir.1995) (holding that a waiver of IDEA claims must be "knowing and voluntary" as judged by the "totality of the circumstances."). The *Matula* court's reasoning as to this issue is compelling. The Court agrees that this heightened level of scrutiny is appropriate in this case.

Although the Second Circuit has not addressed this particular question, it has applied the heightened standard in reviewing waivers of claims under similar federal statutes. *See, e.g., Bormann v. AT & T Communications, Inc.,* 875 F.2d 399, 403 (2d Cir.1989) (applying "knowing and voluntary" standard and "totality of the circumstances" analysis with respect to a waiver of claims pursuant to the Age Discrimination in Employment Act of 1967); *Tung v. Texaco, Inc.,* 150 F.3d 206, 208 (2d Cir.1998) (same, with respect to a waiver of employment discrimination claims pursuant to the Title VII of the Civil Rights Act of 1964); *Laniok v. Advisory Comm. of Brainerd Mfg. Co. Pension Plan,* 935 F.2d 1360, 1367 (2d Cir.1991) (same, with respect to a waiver of right to participate in a pension plan organized pursuant to Employee Retirement Income Security Act of 1974).

 In assessing whether a waiver of an IDEA claim was given voluntarily and knowingly, the *Matula* court looked to the "totality of the circumstances," including the following factors:

> whether (1) the language of the agreement was clear and specific; (2) the consideration given in exchange for the waiver exceeded the relief to which the signer was already entitled by law; (3) the signer was represented by counsel; (4) the signer received an adequate explanation of the document; (5) the signer had time to reflect upon it; and (6)

the signer understood its nature and scope.

67 F.3d at 497 (internal citations omitted). Considering these factors and weighing the evidence before it, the Court concludes that the Stipulation at issue here does not meet the standard of a voluntary and knowing waiver of Somoza's rights under the IDEA.

The language of the Stipulation was anything but "clear and specific." The document, written as though it were as an agreement settling a lawsuit brought by Mary Somoza, contains a number of specific references to a pending litigation or other adversarial proceeding, although no such action was ongoing at the time. For example, the Stipulation refers to "proceedings," "allegations by Mary Somoza," "other litigation," "the defendant," and "claims ... alleged in this action arising out of the events alleged in the complaint." (Trial Ex. 91.) Beyond these ambiguities, the document also lacks sufficient specificity. While purporting to release and discharge "claims alleged ... and ... which were or could have been alleged" (*id.*) in litigation that in fact did not then exist, the Stipulation contains no explicit language that could constitute an express waiver by Somoza of IDEA rights standing separate from and independent of the nonexistent lawsuit to which the agreement relates. It thus appears likely that the Stipulation was poorly adapted by the DOE's legal department from a model agreement used in the context of settling claims ordinarily brought at impartial hearings. Regardless of their source, these irregularities raise serious questions as to the intelligibility and germaneness of the agreement, and to the extent that there was uncertainty with regard to the substance of the purported agreement, the document itself would have done little in the way of clarification.

The evidence also indicates that Mary Somoza did not receive an adequate expla-

nation of the Stipulation. As discussed above, Mary Somoza received the Stipulation in the mail after meeting with Fariña. Mary Somoza testified that, at her meeting with Fariña, she requested an age waiver for Somoza, which would provide for an additional year of the Blau Program to be funded by the DOE. (*See* Trial Tr. at 441–42.) Fariña did not dispute that point in her testimony, adding only that she told Mary Somoza that "it would have to be under the condition[ ] that this was a one year and a one year only extension." (*Id.* at 554.) Mary Somoza testified that there was no discussion of a waiver of any right to request additional time after that year or of her right to bring an IDEA claim. (*See id.* at 443.) Indeed, there is no evidence that Mary Somoza made any mention at that time suggesting a contemplation or threat of litigation under the IDEA or any other ground.

Deputy Superintendent Linda Wernikoff ("Wernikoff") testified that she spoke with Mary Somoza and told her that the DOE "would be sending her a stipulation that would outline the continuing services that Alba would receive for the one year that she had requested." (*Id.* at 573.) Mary Somoza denied having such a conversation with Wernikoff. (*See id.* at 578.) If this conversation did take place, Wernikoff's own testimony indicates that she presented the Stipulation merely as a granting of Mary Somoza's request for a one-year ex-

tension of the Blau Program and did not mention any free-standing waiver of rights specifically grounded on the IDEA.

Likewise, the cover letter to which the Stipulation was attached makes no reference to a waiver of any rights. It states simply, "Please find enclosed a Stipulation of Settlement permitting your daughter, Alba, to attend her current District 75 program through June 30, 2006." (Trial Ex. 91.) The letter also instructed Mary Somoza to direct any questions she might have regarding the stipulation to Wernikoff.

It is uncontested that Mary Somoza was not represented by counsel at the time she signed the Stipulation. The cover letter to which the Stipulation was attached did not suggest that it might be advisable for her to consult an attorney in order to understand the document, and there is no evidence that the DOE made such a suggestion to Mary Somoza at any other time. Given the lack of clarity and specificity in the language of the Stipulation, the advice of counsel would have been especially helpful to a non-lawyer in fully comprehending the substance of the agreement. In particular, with respect to the section of the Stipulation entitled "Release," the use of terms referring to pending litigation, as well as the use of complex and technical legal language, makes it unlikely that it would be understood by a person without legal training.[5]

---

**5.** The one-sentence section entitled "Release" states: "Know that I Mary Somoza, individually and on behalf of Alba Somoza in consideration of an an [sic] extension of one school year of services as outlined above do hereby release and discharge the defendant New York City Board of Education, also known as the New York City Department of Education, which includes CSE District 75, its successors, or assigns, and all past and present officials, employees, representatives and agents of the DOE and the City of New York from any and all claims alleged, and all claims and/or rights of actions that were or

could have been alleged against any of the released parties based on any act, omission, event or or [sic] occurrence from the beginning of the world up to and including the date of the execution of this Release, including, without limitation, any and all claims which were or could have been alleged in this action arising out of the events alleged in the complaint, including any claims that Alba Somoza did not receive and/or was offered a free and appropriate public education, as well as all claims for costs, expenses and attorney's fees." (Trial Ex. 91.)

The evidence supports the conclusion that Mary Somoza did not fully understand the nature and scope of the agreement. She testified at the trial that she did not understand the release but signed it anyway because she felt she had no choice. In her mind, the risk of an interruption to her daughter's educational services was too great. (*See* Trial Tr. at 449.) On this point, Mary Somoza's testimony appears to be somewhat inconsistent with the testimony she gave at the impartial hearing, where she indicated that she signed the Stipulation at least in part based on advice from Blau, then a second-year law student, that it would not hold up in court. (*See* Impartial Hr'g Tr., attached as Ex. 4 to A.R., at 170.)

▮ The two other factors identified by the *Matula* court—whether the consideration given in exchange for the waiver exceeded the relief to which the signer was already entitled by law and whether the signer had time to reflect upon the agreement—have little significance in the present case. The consideration given in exchange for the waiver, a one-year extension of educational services, might have been less than Somoza would have received after an impartial hearing or civil action, if it were indeed determined that she had been denied a FAPE. However, whereas the provision of a FAPE is a legal right provided by the IDEA, compensatory education is a judicially-crafted equitable remedy designed to make up for a denial of a FAPE that has already occurred. *See Cosgrove v. Board of Educ. of Niskayuna Cent. Sch. Dist.*, 175 F.Supp.2d 375, 387 (N.D.N.Y.2001). Accordingly, Somoza was not *already* entitled to any amount of compensatory education at the time the Stipulation was signed. As to whether Mary Somoza had time to reflect upon the agreement before signing it, the dates of Mary Somoza's correspondence with the DOE suggest that she had the agreement for between one and two weeks, which is an adequate amount of time under the circumstances.

Taking these factors together, the Court finds that Mary Somoza did not knowingly and voluntarily waive Somoza's right to bring a claim for a violation of the IDEA. The weight of the evidence supports the view that Mary Somoza sought an age waiver from the DOE in her meeting with Fariña and that the DOE subsequently mailed her the Stipulation, which she signed without fully comprehending the substance or full implications of the agreement. There is no evidence that a waiver of Somoza's educational rights was mentioned at Mary Somoza's meeting with Fariña or in any other conversations with DOE employees or in any correspondence from the DOE. The only notice that Mary Somoza received regarding what DOE contends constituted a waiver of rights came from the release language of the Stipulation itself, which Mary Somoza played no role in drafting, which contained a number of inapplicable and confusing references to nonexistent allegations of nonexistent claims Somoza allegedly made or could have made in then nonexistent litigation, and which was not written in language accessible to a non-lawyer. Mary Somoza was not represented by counsel, who theoretically could have explained to her the Stipulation in all its ambiguities and irrelevancies, advised her as to whether to sign it, and possibly aided her in negotiating different or more pertinent terms with the DOE. Mary Somoza was under significant pressure to sign the document, although not rising to the level of duress, and the DOE had superior bargaining power, a point that it conceded at the impartial hearing. (*See* Impartial Hr'g Tr., attached as Ex. 4 to A.R., at 117.)

It is worth noting that this Stipulation was not reached in the context of an impartial hearing or other formal legal proceeding, where the purported agreement

could have been fully explained and the signer's understanding of the rights she was allegedly waiving could have been demonstrated as part of an official record. Where a claimed waiver of essential rights of a person unrepresented by counsel does not take place in a structured legal environment, it is not particularly burdensome to require the DOE to comply with basic procedural safeguards, especially in a situation in which the document at issue was unilaterally prepared by DOE itself.

### D. DENIAL OF FAPE

#### 1. Remand to State Administrative Agency

■■■■ Consistent with the de novo review standard applicable in IDEA cases, a district court is free to substitute its judgment for the administrative agency's if the court does not agree with the agency's rulings with respect to issues of law, and specifically the proper interpretation of the federal statute and its requirements. *See Milford Bd. of Educ.,* 103 F.3d at 1122. The Court also has discretion to remand the case to the agency, and in cases where a de novo standard applies, "courts tend still to return the decision to the agency in order to rely on the agency's expertise and protect the integrity of the administrative process." 33 Charles A. Wright & Charles H. Koch, *Federal Practice & Procedure* § 8313. Such an action is particularly appropriate in the present case in light of the educational policy considerations involved, and particularly taking into account that the administrative agencies did not address the merits of Somoza's claims.

In similar situations, district courts in the Second Circuit have remanded IDEA cases to administrative agencies. *See, e.g., Gagliardo v. Arlington Cent. Sch. Dist.,* 373 F.Supp.2d 460, 461 (S.D.N.Y.2005) (reversing SRO as to timeliness of appeal and remanding for a hearing on the merits: "Since this Court reviews the administra-

tive record de novo in an IDEA case, I suppose I could simply view the administrative process as complete and proceed to the merits of the parties' dispute. I do not think that the wisest course, nor is it required: ...."); *Juzwic,* 891 F.Supp. at 718–19 ("The administrative record created to date in this case is long on arguments about legal issues like timeliness (in which non-lawyer hearing officers have no particular expertise) and painfully short on the issue where expertise is needed, that is, whether [the student] received an education appropriate for his needs.... [The court] might reasonably choose, in light of that record, to defer the first decision on [the student's] entitlement for compensatory education to the State Board of Education's administrative process.").

■■■■ Because neither the IHO nor the SRO addressed the merits of the claims, the Court remands the case for a hearing on whether Somoza was denied a FAPE prior to her participation in the Blau Program, and if so, whether the period of compensatory education requested here is appropriate under the circumstances. In order to aid the agencies in these determinations, the Court sets forth below some pertinent legal guidance and factual considerations.

#### 2. A Free Appropriate Public Education

As the Supreme Court noted in *Board of Educ. v. Rowley,* the IDEA does not contain express language prescribing a substantive standard with respect to the level of educational services that constitutes an "appropriate" education. 458 U.S. 176, 189, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). In *Rowley,* the Court set forth the basic parameters of the educational services required by the IDEA, although it conceded that "[t]he determination of when handicapped children are receiving sufficient educational benefits to satisfy the require-

ments of the Act presents a ... difficult problem," and it cautioned that it was not attempting to "establish any one test for determining the adequacy of educational benefits conferred upon all children covered by the Act." *Id.* at 202, 102 S.Ct. 3034.

The *Rowley* Court held that, under the IDEA, states need not "maximize each handicapped child's potential," but they are required to "provide a 'basic floor of opportunity' consistent with equal protection." *Id.* at 199–200, 102 S.Ct. 3034 (*quoting* H.R. Rep No. 94–332, at 14, 1975 U.S.C.C.A.N. 1425, at 1438 (1975)). The Court further stated that "[i]mplicit in the congressional purpose of providing access to a 'free appropriate public education' is the requirement that the education to which access is provided be *sufficient to confer some educational benefit* upon the handicapped child." *Id.* at 200 (emphasis added). In other words, a disabled student's access to public education must be "meaningful." *Id.* at 192, 102 S.Ct. 3034; *Walczak,* 142 F.3d at 130 ("[T]he door of public education must be opened for a disabled child in a 'meaningful' way."). Accordingly, the Second Circuit has held that the IDEA "contemplates more than 'mere trivial advancement,'" *Milford Bd. of Educ.,* 103 F.3d at 1121 (*quoting Polk v. Central Susquehanna Intermediate Unit 16,* 853 F.2d 171, 183 (3rd Cir.1988)), and that a disabled student's educational program must be designed so as to provide "meaningful educational benefit." *Id.* at 1120.

■ Therefore, "[i]n an action challenging the adequacy of an educational placement under the IDEA," a district court must determine "whether the educational program provided for a child is *reasonably calculated* to allow the child to receive educational benefits." *Id.* (*citing Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034) (emphasis added). In this case, the

allegation that the DOE failed to provide a FAPE stems from Somoza's assertion that the educational services she receives were not sufficiently customized to her particular combination of disabilities. Because students with different disabilities generally do require different education programs for them to receive educational benefits, the requirement that the program be both "meaningful" and "reasonably calculated" to confer educational benefits implies that the program must be customized to the student's disabilities. Indeed, that is the primary purpose of requiring an IEP. As the Second Circuit recently stated in *A.A. ex rel. J.A. v. Philips,* "IEPs are *highly customized* educational programs that are tailored to the particular, unique needs of disabled students." 386 F.3d 455, 458 (2d Cir.2004) (emphasis added). *See also Ms. S. ex rel. G. v. Vashon Island Sch. Dist.,* 337 F.3d 1115, 1119 (9th Cir.2003) (An IEP "is a special education plan that must be customized for each special education student ....").

As discussed above, the witness testimony and evidence admitted at trial raises significant doubts as to whether the educational services provided to Somoza prior to the Blau Program were sufficiently customized for her particular set of needs and disabilities. In particular, questions arose as to whether Somoza's assignments were appropriate to her level of academic ability, and whether they fit into a comprehensive plan that was tailored to meeting her educational needs. These questions implicated both what was provided to Somoza in some educational material that may have far exceeded Somoza's level of comprehension and achievement at that time, and what was not provided to address more basic reading and communication skills that might have enabled her to grasp the more advanced content more readily.

■ The questions regarding the suitability of Somoza's educational plan are all

the more pressing in light of the apparent lack of any meaningful progress in her academic performance from the time of the 1993 report by Blau to her IEP report dated May 24, 2002. As discussed above, the 2002 report, which was prepared shortly before Somoza graduated from the School of the Future, indicates that she was then performing academically at the kindergarten to fourth grade levels. Not surprisingly, in arguing at trial that she was denied a FAPE, Somoza made frequent reference to that IEP report. The DOE does not contest the accuracy of this report so much as argue that the focus on end goals and achievement levels is misplaced. The DOE correctly points out that, as the SRO wrote in his decision, a FAPE should not be viewed as "an end accomplishment of years of education." (Decision of SRO, No. 06–086, attached as Ex. 14 to A.R., at 7.) *See Rowley*, 458 U.S. at 192, 102 S.Ct. 3034. Nonetheless, although the achievement of particular goals does not define a FAPE, the level of objectively measured academic ability reached by a student is a relevant factor in assessing whether a FAPE was provided, particularly when compared with levels of performance the student achieved during a substantially greater number of years and levels of education prior to the relevant time period.

Likewise, a comparison of the level of academic performance achieved by the student subsequent to the time period in question is also a relevant measure in determining whether a student received a FAPE. The Second Circuit has noted that "a child's academic progress must be viewed in light of the limitations imposed by the child's disability." *Milford Bd. of Educ.*, 103 F.3d at 1121. A student's dramatic increase in academic performance under a subsequent educational plan, such as that which appears to have occurred with respect to Somoza in the Blau Pro-

gram, contrasted with demonstrable lack of progress manifested during an earlier period under other educational interventions, offers persuasive evidence that the prior lower performance was not necessarily a product of any inherent limitation in the student's intellectual ability, and therefore that, despite her physical handicap, the student had not reached the maximum level of academic achievement of which she was capable. Accordingly, to the extent that the special education methods and technology used in the Blau Program were generally known, available to the DOE, and being successfully employed in other cases well prior to 2002, questions exist as to why they were not applied earlier in Somoza's education, and whether if they had been offered to her she might have experienced substantial improvement sooner.

### 3. Compensatory Education

Generally, under the IDEA, a disabled student does not have the right to demand a public education beyond the age of twenty-one. *See Mrs. C. v. Wheaton*, 916 F.2d 69, 75 (2d Cir.1990). However, compensatory education for a student over that age is available as an equitable remedy where there has been a "gross" violation of the IDEA, which occurs when a student has been deprived of a FAPE for a substantial period of time. *Id.* "Such an award requires a school district to provide education past a child's twenty-first birthday in order to make up for the earlier deprivations. It is an equitable remedy directed at a school district's failure to provide that which [it] was obligated to provide earlier." *Cosgrove*, 175 F.Supp.2d at 387 (*citing Burr v. Ambach*, 863 F.2d 1071, 1078 (2d Cir.1988)).

### E. CONTINUATION OF PRELIMINARY INJUNCTION

On September 15, 2006, the Court extended the preliminary injunction original-

ly put into effect by Judge Holwell until a determination was reached resolving the merits of the claims that Somoza asserts in her complaint. As the case is now remanded to the administrative agencies for further proceedings, the Court concludes that the preliminary injunction should remain in effect until a final decision is reached on the merits of Somoza's claims.

■ The Court is aware that a remand, with the potential for appeal to the SRO and subsequent civil action in this Court, is a time-consuming process. The Court is also mindful that the continued funding of the Blau Program pending these proceedings comes at a substantial cost to the DOE. However, the Court finds that the standard set forth by the Second Circuit for injunctive relief continues to be met in this case. Injunctive relief requires a showing of "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). There have been no changes in circumstances or other developments that would justify a reversal of the Court's previous determination that both prongs of this test are satisfied. *See Somoza,* 2006 WL 1981758.

### III. *POSTSCRIPT*

Because the Court's decision detailed above calls for further proceedings to address the merits of the claims here at issue, to aid the parties as they weigh their next steps and approaches to any more litigation that may ensue from this ruling, the Court adds this postscript offering some insights and backdrop that may serve to guide the parties' considerations.

The hardest disputes for courts to adjudicate, and the cases which tend to give the law some of its most difficult twists and turns, are often those that are guided not by what appears on the surface of the parties' conflict as its reason for being, but by the unstated undercurrents roiling the controversy. In these circumstances, the judicial challenge of charting the mainstream of governing legal principles to steer a course to a right and just result is sometimes complicated or prolonged by unproductive digressions, dead ends and detours to which the litigation theory and tactics the parties pursue may lead. The matter here decided is a case in point.

Ostensibly, this dispute is about education. On paper it concerns the meaning of the term "free appropriate public education" under the federal statute at issue, and more specifically as that provision applies to the special educational needs of one severely disabled student, Alba Somoza, and her efforts to avail herself of the rights and benefits associated with the government's promise of public education.

A further word about Somoza and her unique educational experiences may shed more contextual light on the point essayed here. As described above and elaborated here, the portrait that emerges from the record before the Court detailing Somoza's schooling, especially as highlighted by her recent dramatic progress, demonstrates that though severely disabled, Somoza is not just a person occupying a wheelchair, unable to function alone and entirely dependent upon the efforts and kindness of others to manage the activities of daily living. Rather, behind the silence and almost total immobility caused by her incapacitation, indeed laboring strenuously against her physical affliction, there is a lively being struggling to break from her physical constraints so as to give herself expression; she is a vibrant young woman with an active mind eager for knowledge, and one who seeks to enjoy the values and

pleasures of learning. Manifestly, that inner person who communicates with others by means of this human vitality is striving to be fulfilled, both in the sense of learning about the world around her, and in the larger import of finding her place in it and making a meaningful social contribution with greater independence, as well as less reliance on the intellectual assistance of other people. In this respect Somoza may represent a model of the disabled individuals the enactment of IDEA was designed to reach and to serve, those who seek the benefits of the national policy the statute prescribes: "equality of opportunity, full participation, independent living and economic self-sufficiency." 20 U.S.C. § 1400(c)(1).

Regrettably, if in reality Somoza's learning and life ambitions and the compelling legal issues associated with her educational needs had been the sole interests given decisive weight before this lawsuit commenced, the disagreement these parties brought to this Court might never have come about. Nor perhaps would the controversy have taken the unhappy turns in which it has been mired, at the considerable costs of the energies and resources that both the parties and the Court have devoted to the matter over these many months. Instead, what the Court views as the unstated dominant perceptions fueling the litigation seem like collateral issues: whether Somoza's mother, in advocating actively on behalf of her daughter to secure for Somoza the benefit of a full public education, duped the DOE and sought to take advantage of what the DOE regards as its exceptional compassion and generosity towards Somoza; or whether, as Mary Somoza contends, the DOE, in an effort to cover its back because it failed to provide Somoza an appropriate public education, is now unduly entrenched, rigid and formalistic in construing and honoring its remaining educational obligation to Somoza.

Thus, as commonly happens when feuds are plunged into the depths of extreme litigation, this conflict has taken on a quality of ancient Greek drama. When titans at loggerheads do battle, not infrequently other interests and other persons, even those with far greater stakes in the larger scheme of things, are caught in the middle, or shunted aside to a seemingly incidental role by forces beyond their control. In the end, those sidelined interests risk suffering deeper or unjustifiable consequences. What then tends to bring the action to climax and resolution is not necessarily what appears as the public face of the dispute, but the compounding undertow of emotions that contort the parties' relationships and pull the controverted events deeper into conflict.

Three propositions typically hold true when these circumstances characterize legal disputes. First, on a fair and rational parsing of the merits of the conflict, neither party can be found unequivocally right or unequivocally wrong in all respects. Rather, in the final analysis, equities could be found to justify aspects of either side. Second, however intensely the adversaries may feel about the merits of their particular cause, and whatever the distance dividing them, more often than not, as they themselves would concede, the dispute leaves ample room for common ground and shared interests, and these values could serve as basis for a balanced adjudication of remaining disagreements when honest will to pursue amicable means exists. Third, the path to total victory, though always an available option for litigants to press on relentlessly, is invariably marked by manifold risks, uncertainties and potentially counterproductive ends. The adverse prospects associated with a litigation strategy demanding nothing less than a final unqualified triumph ordinarily do more to retard rather than advance a satisfactory final outcome consistent with

more immediate and tangible gains that the disputants could mutually garner from realizing common interests by earlier resolution.

## IV. *ORDER*

For the reasons discussed above, it is hereby

**ORDERED** that this case be remanded to the Impartial Hearing Office of the Department of Education for the City of New York for further proceedings consistent with the Court's decision; and it is further

**ORDERED** that the preliminary injunction entered by this Court against defendant New York City Department of Education by Order dated July 20, 2006, shall remain in force and effect pending a final determination of the merits of the claims asserted by plaintiff Alba Somoza in her complaint herein.

The Clerk of Court is directed to close this case.

**SO ORDERED.**